## HARRIS COUNTY HOSPITAL DISTRICT, Appellant,

v.

## Autrey GARRETT, Individually and as Next Friend of J.G., D.G., and S.G., Minor Children, Appellees.

No. 01–06–00782–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 3, 2007.

---

John Arlen Pruitt, Assistant County Attorney, Houston, TX, for Appellant.

Chad Bassett Matthews, League City, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

TERRY JENNINGS, Justice.

In this interlocutory appeal,[1] appellant, Harris County Hospital District ("HCHD"), challenges the trial court's order denying its motion to dismiss the health care liability claim[2] of appellees,

---

**1.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (Vernon Supp.2006).

**2.** " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative ser-

vices directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." *Id.* § 74.001(a)(13) (Vernon 2005). "Health care provider" includes any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas

Autrey Garrett, individually and as next of friend of J.G., D.G., and S.G., her minor children.

We affirm the trial court's order.

## Factual and Procedural Background

In their original petition, the Garretts allege that HCHD and others[3] were negligent in failing to notify her of her diagnosis of ductal carcinoma of the breast until July 2005, even though pathology findings establishing this diagnosis were made on December 1, 2003, resulting in a significant delay of Garrett's treatment and the advancement of her cancer.

In October 2003, Garrett sought obstetrics and gynecology care at Lyndon B. Johnson Hospital ("LBJ"), and Dr. John Riggs "assumed care of [Garrett]." Riggs "discovered a breast mass" in Garrett's left breast and ordered a breast ultrasound, which was performed on October 6, 2003 and revealed that the mass was "possibly suspicious for malignancy." Garrett followed up on the results with the Breast Clinic at LBJ, which scheduled a biopsy. The biopsy was performed on November 25, 2003, and Garrett was "given a follow up appointment with the Breast Clinic for December 10, 2003 to discuss the results." Although a "pathology report was ready" on December 1, 2003, Garrett was not informed of the results of the biopsy until July 2005.

Garrett "transferred her care to Dr. Enrique Ortega," and, during her first visit with him on November 13, 2003, Ortega also "noted a left breast mass." At a January 15, 2004 appointment, Dr. Ortega told Garrett that he "would obtain her biopsy report from LBJ" because Garrett had informed him that LBJ "was charging $90 for same." Although Ortega delivered Garrett's baby on April 23, 2004, and Garrett returned to Ortega for two more appointments, he never informed Garrett of the biopsy results.

In July 2005, Garrett went to the LBJ emergency room complaining of "worsening pain" in her left breast, and she was told, for the first time, of her diagnosis of ductal carcinoma "from the initial November 25, 2003 needle biopsy." During this visit, the LBJ oncology clinic evaluated Garrett and informed her that she had "metastic breast cancer which had spread to her lumbar spine and lymph nodes in her chest."

The Garretts allege that the defendants were negligent in failing to (1) "timely inform [Garrett] of her cancer"; (2) "procure the results of the November 25, 2003 biopsy"; and (3) "follow appropriate American College of Radiology ('ACR') guidelines." Garrett contends that as a result of defendants' negligence, her "cancer spread beyond the confines of her breast," rendering her "treatment options and the effectiveness of treatment ... much more limited" and "resulting in injuries from an acceleration and metastatis of her cancer, a significantly reduced life expectancy, lost effective medical treatment and therapy, and medical and surgical treatment that was unnecessary." The Garretts seek damages for physical pain, impairment, mental anguish, disfigurement, medical ex-

to provide health care, including a registered nurse or a health care institution. *Id.* § 74.001(a)(12)(A). "Health care institution" includes a hospital or a hospital system. *Id.* § 74.001(a)(11).

**3.** The Garretts sued HCHD doing business as Lyndon B. Johnson Hospital ("LBJ"). Thus, references in this opinion to LBJ implicate HCHD. The Garretts also sued Michelle Lesslie, D.O., Marian Bonner, M.D., Emily Robinson, M.D., Enrique Ortega, M.D., the University of Texas System, and the University of Texas Health Science Center at Houston, none of whom are parties to this appeal.

penses, lost earnings, and loss of consortium.

The Garretts timely served HCHD with an expert report[4] by Dr. Robert McWilliams, M.D. In his report, McWilliams details his qualifications as follows:

I am a board-certified OBGYN and a Fellow of the American College of Obstetricians and Gynecologists. I am also board eligible in Reproductive Endocrinology. I have practiced obstetrics and gynecology as a private practitioner in Denver, Colorado from July 1979 through June, 1998, following my residency at Los Angeles County/USC Medical Center. I completed a 2–year fellowship in Reproductive Endocrinology at Baylor College of Medicine in Houston in June 1990. I was an assistant professor in the Department of Obstetrics and Gynecology, Division of Reproductive Endocrinology at the University of Texas Medical School at Houston from 1990 through 1992. I was Head of the Division of Reproductive Endocrinology, Department of Obstetrics and Gynecology at MacGregor Medical Association in Houston from January, 1993 until October, 1999. I reentered private practice in 2000, and am currently a solo practitioner in Gynecology and Reproductive Endocrinology in Houston, Texas.

In preparing his report, Dr. McWilliams reviewed the pertinent office and clinical notes and lab and radiology reports of Dr. Ortega, Dr. Riggs, and LBJ. These records reveal that Garrett began receiving obstetrical care at LBJ in September 2003 and "underwent her first obstetrical exam with L. Hunt, WNPC on October 3, 2003." Hunt, a nurse practitioner, recorded a nodule on Garrett's left breast and made notes "reflecting appropriate assessment and plans for referral." Furthermore, "the attending physician," Riggs, "also made a note … reflecting knowledge of the breast exam and nodule."

These records reveal that Garrett had an ultrasound performed at LBJ on October 6, 2003, and, as a result, LBJ's "radiology staff" recommended a biopsy. Dr. Riggs was notified of the findings of the ultrasound on October 10, 2003, and, on that same date, a "referral note [was] made for [Garrett] to go to the breast clinic." Garrett attended her second prenatal visit at the "LBJ obstetrical clinic" on October 31, 2003, and Hunt again examined her. Hunt's notes reflect that Hunt "continued surveillance" of Garrett's breast nodule and that Garrett had a biopsy appointment in November 2003. Garrett attended her third prenatal visit at the "LBJ obstetrical clinic" on November 26, 2003, and Hunt again examined her. Notes from this exam indicate that Garrett's biopsy was performed on November 25, 2003 and that a follow-up appointment was scheduled for December 10, 2003.

The records of the LBJ radiology department also show that Garrett's biopsy was performed on November 25, 2003 and that samples "were obtained and sent to pathology for review." The LBJ pathology department's report indicates a "final pathologic diagnosis" of ductal carcinoma.[5]

Dr. Ortega's notes and Garrett's medical records show that Garrett transferred her

---

**4.** *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (Vernon Supp.2006).

**5.** Dr. McWilliams summarizes the report as follows: "A final pathological diagnosis of the biopsied left breast nodule to be 'breast with ductal carcinoma, modified Black's Nuclear Grade: 3 (poorly differentiated), focus suspicious for lymphovascular invasion identified, and ductal carcinoma in situ: possible foci present, await immunostains for confirmation.'"

care to Ortega in late 2003 and that Ortega provided Garrett obstetrical care until April 20, 2004. On November 13, 2003, during Ortega's initial physical of Garrett, he noted her abnormal breast mass. Furthermore, an "authorization for release of information" was completed, authorizing LBJ to release Garrett's records to Ortega. Although Ortega's notes from Garrett's December 18, 2003 visit show that the results of Garrett's biopsy were "to be given on 12/23/03," on January 15, 2004, Ortega noted that he was "[u]nable to obtain Bx. Results (LBJ.), last mo., (Hospital Reportedly charging pt. $90.00 to give her results!?). Report requested." Thus, as Dr. McWilliams notes in his report, there is some evidence that, despite their requests, Ortega and Garrett were not able to obtain the biopsy results from LBJ.

Dr. McWilliams further states in his report that Garrett visited the LBJ emergency room on July 11, 2005 "with a 6 month history of left breast pain and swelling." LBJ's notes reveal that a breast ultrasound and a surgical consult with the oncology clinic was ordered, and a specific note from the emergency room to the oncology service stated "no follow up on this ever, please evaluate." McWilliams reviewed Garrett's subsequent medical records, which confirmed the existence of "advanced disease . . . with metastasis." Garrett initiated treatment soon after she learned of her diagnosis.

Based upon the above facts, Dr. McWilliams opines in his report that "the medical care provided by LBJ Hospital and the physicians providing care to Garrett fell below the standard of care." McWilliams further opines that "[n]umerous physicians and support staff personnel at LBJ Hospital were involved in Ms. Garrett's diagnosis and confirmation by breast biopsy of breast cancer[,] [y]et notification of this unfortunate diagnosis to Ms. Garrett soon after the diagnosis" was never made "via phone call or certified letter." In response to any potential defenses to be raised by LBJ and its staff, McWilliams concludes that "[t]he fact that Ms. Garrett transferred her care to an obstetrician outside the LBJ hospital system [did] not absolve them from notifying Ms. Garrett of her breast cancer diagnosis." Also, accepting the truth of Dr. Ortega's notes regarding his inability to obtain the biopsy's results from LBJ and LBJ's attempt to charge Garrett $90 before releasing her results, "the medical records department of LBJ Hospital was also liable in contributing to the failure to notify Ms. Garrett of her diagnosis of cancer before it continued to advance to a stage of poorer prognosis." With regard to the LBJ Hospital system, McWilliams stated,

Where the greatest degree of medical liability within the LBJ hospital system lies with respect to notification of this diagnosis to Ms. Garrett is difficult to say. From

(1) Dr. Riggs, her obstetrician who first made the diagnosis of a left breast mass to[;]

(2) L. Hunt, her nurse practitioner who initially examined Ms. Garrett's left breast mass and continued her surveillance of the mass and recommended Ms. Garrett keep her appointments with the radiology department for a diagnosis of this mass to[;]

(3) the radiology staff or physicians who performed the needle biopsy of the breast mass to[;]

(4) the pathology department where the tissue diagnosis was initially made to[;]

(5) the medical records department who may or may not have refused to give Ms. Garrett her medical records,

a combination of factors more than likely contributed to the failure to notify Ms. Garrett of her breast cancer diagnosis.

. . . .

Without a diagnosis of breast cancer then, no effective diagnostic measure and therapeutic options were considered or offered Ms. Garrett. The inevitable consequence of Ms. Garrett's breast cancer and its advancement to a poor prognosis with metastasis over an approximate 20 month delay could most likely have been prevented with confirmation of the disease at the time of her biopsy.

HCHD filed objections to Dr. McWilliams's report and a motion to dismiss, which the trial court denied.

### Standard of Review

■ We review a trial court's decision on a motion to dismiss under section 74.351 for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (predecessor statute); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Gray,* 189 S.W.3d at 858.

### Expert Report

In its sole issue, HCHD argues that the trial court abused its discretion in denying its motion to dismiss because Dr. McWil-

liams's expert report (1) "included no curriculum vitae and nowhere in the body of the report did it show the author was a competent expert as to [HCHD]"; (2) "failed to identify the standard of care applicable to [HCHD]"; and (3) "failed to show that any conduct of [HCHD] caused any damages."

A plaintiff bringing a healthcare liability claim must provide each defendant health care provider with an expert report or voluntarily nonsuit the action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2006); *Gray,* 189 S.W.3d at 858. The expert report is defined as a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2006). If a plaintiff timely files an expert report, a defendant may then file an objection challenging the sufficiency of the report. *Id.* § 74.351(a). The trial court shall grant a motion to dismiss only if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(*l* ).

■ The only information relevant to the inquiry is within the four corners of the document. *Palacios,* 46 S.W.3d at 878. Although the report need not marshal all the plaintiff's proof, it must include the expert's opinion on each of the elements identified in the statute. *See Palacios,* 46 S.W.3d at 878–79; *Gray,* 189 S.W.3d at 859. In setting out the expert's opinions, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. *Palacios,* 46 S.W.3d at 879. First, the report must

inform the defendant of the specific conduct the plaintiff has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. However, a plaintiff need not present evidence in the report as if she were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.*

### Curriculum Vitae and Qualifications

HCHD first contends that it was not permissible for Dr. McWilliams to set forth his curriculum vitae in a paragraph contained in his expert report. Alternatively, HCHD contends that the curriculum vitae is "grossly inadequate" because it fails to establish Dr. McWilliams's credentials as an expert "on the operation of a major metropolitan hospital's records systems or pathology labs."

■ In regard to the Garretts' service of Dr. McWilliams's curriculum vitae, HCHD has failed to cite any authority for the proposition that a curriculum vitae must be furnished as a separate document.[6] Section 74.351(a) provides merely that a claimant shall serve "one or more expert reports, *with a curriculum vitae of each expert.*" Tex. Civ. Prac. & Rem.Code

Ann. § 74.351(a) (Vernon Supp.2006) (emphasis added). Section 74.402, which addresses the qualifications of an expert in a suit against a health care provider, also does not include a requirement that a curriculum vitae be served as a separate document. *Id.* § 74.402 (Vernon 2005).

■ In regard to Dr. McWilliams's qualifications, section 74.351 defines "expert," with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, to mean "an expert qualified to testify under the requirements of Section 74.402." *Id.* § 74.351. Under section 74.402, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person,

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert

---

6. *Papkov v. Schiffman,* No. 01–00–01099–CV, 2002 WL 1041118, at *1 (Tex.App.-Houston [1st Dist.] May 23, 2002, no pet.) (mem. op.), the case cited by HCHD in support of its argument, is not on point as the appellant in that case wholly failed to file a curriculum vitae. *Id.* Moreover, we note that the Corpus Christi Court of Appeals has rejected a similar

complaint. *See Carreras v. Marroquin,* No. 13–05–082–CV, 2005 WL 2461744, at *2 (Tex. App.-Corpus Christi Oct. 6, 2005, pet. filed) (mem. op.) ("The statute does not expressly prohibit a claimant from including the curriculum vitae within the body of the report, as was done in this case.").

opinion regarding those accepted standards of health care.

*Id.* § 74.402(b) (Vernon 2005).

"Practicing health care" is defined as including (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider. *Id.* § 74.402(a)(1), (2). To determine whether an expert "is qualified on the basis of training or experience" under subsection (b)(3), a court is to consider whether the expert (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim and (2) is actively practicing health care in rendering health care services relevant to the claim. *Id.* § 74.402(c)(1), (2) (Vernon 2005).

As stated in his expert report, Dr. McWilliams is "a board-certified OBGYN and a Fellow of the American College of Obstetricians and Gynecologists" and is also "board eligible in Reproductive Endocrinology." Following his residency, McWilliams practiced obstetrics and gynecology from July 1979 through June 1988. Then, after completing a two-year fellowship in Reproductive Endocrinology at Baylor College of Medicine, he served as an assistant professor at the University of Texas Medical School in the Department of Obstetrics and Gynecology for two years. McWilliams subsequently served as the head of the reproductive endocrinology division for the department of obstetrics and gynecology at a medical association for approximately seven years. Finally, he reentered private practice in 2000, and currently practices as a solo practitioner in gynecology and reproductive endocrinology in Houston.

We note that the specific nature of the Garretts' claims is that HCHD employees and staff failed to inform Garrett of her diagnosis and failed to release her medical records to both her and her doctor. The pertinent standard of care identified in Dr. McWilliams's report is that HCHD employees and staff should have timely informed Garrett of her cancer diagnosis and should have released her medical records, including her biopsy results, to both her and her doctor upon their respective requests. In regard to the nature of the Garretts' claims and the pertinent standard of care, HCHD has provided us with no authority that would require McWilliams to possess expertise "on the operation of a major metropolitan hospital's records systems or pathology labs."

We conclude that Dr. McWilliams is qualified to serve as an expert on the issue of whether HCHD departed from the accepted standards of care in regard to the Garretts' claims. McWilliams established his expertise in the fields of obstetrics and gynecology and satisfied the statutory requirements by showing that he is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by HCHD; has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. Accordingly, we hold that the trial court did not err in denying HCHD's motion to dismiss the health care liability claims of the Garretts on the grounds that Dr. McWilliams set forth his curriculum vitae in his expert report and that he did not establish his credentials as an expert "on

the operation of a major metropolitan hospital's records systems or pathology labs."

**Standard of Care**

HCHD next argues that Dr. McWilliams's report is inadequate because "it fails to identify the standard of care that was allegedly breached" and "never states what should have been done." HCHD asserts that McWilliams's statements in his report that no person notified Garrett of her diagnosis does not establish that the standard of care required such notification. HCHD also asserts that Garrett was being treated by multiple health care providers, including nurses and physicians, "who all may or may not have had access to the information," and that the complaint that all of those providers failed to inform her of her cancer diagnosis does not show a duty owed by any one provider.

In identifying the standard of care, whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios*, 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See Doades v. Syed*, 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

The pertinent standard of care identified by Dr. McWilliams is that an HCHD employee should have informed Garret of her biopsy results and should have released those results upon Garrett's or Dr. Ortega's request. *See Columbia Rio Grande Regional Healthcare, L.P. v. Hawley*, 188 S.W.3d 838, 843–44, 848–51 (Tex.App.-Corpus Christi 2006, pet. filed) (affirming jury verdict against hospital for its negligence in failing to timely and properly convey cancer diagnosis to patient for almost full year); *see also Bowie*, 79 S.W.3d at 52 (recognizing that report fairly summarized standard of care because it stated that hospital should have established procedures to read and interpret x-rays in timely manner and to inform patients about results). HCHD asserts that no one, other than the pathology department and records department, are even mentioned in the report in relation to the hospital. However, although the report primarily focuses on the actions of Garrett's treating physicians, including Dr. Riggs, the attending physician at LBJ, the report also specifically references both the conduct of nurse practitioner Hunt and the conduct of LBJ's medical records department in refusing or failing to release Garrett's biopsy results when Dr. Ortega and Garrett requested those results. Thus, we conclude, from our review of the four corners of the report, and in light of the specific nature of the Garretts' claims, that the report informs HCHD of the specific conduct that the Garretts have called into question, the standards of care that should have been followed, and what HCHD should have done. Accordingly, we hold that the trial court did not err in denying HCHD's motion to dismiss the health care liability claims of the Garretts on the ground that McWilliams's report fails to identify HCHD's standard of care and state what HCHD should have done.

**Causation**

Finally, HCHD asserts that Dr. McWilliams's report "never identifies what caused the alleged damages" and does not show that Garrett "actually sustained" any damages. HCHD also asserts that the

report indicates only that the delay in informing her of her diagnosis led to a "a *poor forecast* for the disease," which "is not an actual damage." Further, HCHD asserts that the report did not show "that anything different would have happened." As noted above, an expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Here, Dr. McWilliams states in his report that Hunt, a nurse practitioner who examined Garrett during her prenatal visits, was assisting in "continued surveillance" of Garrett's breast nodule, was aware of the biopsy, and failed to inform Garrett of her diagnosis. McWilliams also states in his report that the LBJ radiology department performed a biopsy of Garrett's left breast on November 25, 2003, the biopsy samples were sent to LBJ's pathology department for review, and a "final pathologic diagnosis" of ductal carcinoma was made on December 1, 2003, yet Garrett was never notified of this diagnosis by any LBJ employee. McWilliams opined that nurse Hunt as well as LBJ employees in the pathology department and LBJ's "radiology staff" had a responsibility to notify Garrett of this diagnosis. McWilliams also cited in his report a note from LBJ's emergency room to the oncology service, made after Garrett visited the LBJ emergency room in July 2005, that stated *"no follow up on this ever, please evaluate."* (emphasis added).

Furthermore, Dr. McWilliams's report indicates that after Garrett transferred her care to Dr. Ortega, an OBGYN outside of the LBJ system, Ortega and Garrett sought to obtain the biopsy results from LBJ, but were unable to obtain them. McWilliams opined that LBJ staff in the medical records department had a responsibility to provide Garrett her medical records, including her biopsy results, and that the failure to provide those results violated HCHD's standard of care. Again, in response to any potential claim by HCHD that Dr. Ortega, or another treating physician for which HCHD was not liable, was solely charged with the responsibility to notify Garrett, McWilliams asserted that HCHD was not absolved of its responsibility to notify Garrett of her diagnosis because she transferred her care to a doctor outside the LBJ system. McWilliams also noted in his report, despite HCHD's apparent failure or refusal to release Garrett's records, that a form authorizing the release of her medical records to Dr. Ortega had been completed.

In regard to whether Garrett sustained any harm as a result of the approximately one and one-half year delay in learning of her cancer diagnosis, Dr. McWilliams stated in his report that when Garrett finally visited the LBJ emergency room, she presented "with a 6 month history of left breast pain and swelling." At this point, Garrett had developed "advanced disease ... with metastasis." McWilliams further stated that because of the delay in communicating the diagnosis, "no effective diagnostic measure and therapeutic options were considered or offered Ms. Garrett," with the "consequence" of the cancer's "advancement to a poor prognosis with metastasis." McWilliams opined that such advancement with metastasis [7] "could most likely have been prevented with confirmation of the disease at the time of her biopsy" and absent the "approximate 20 month delay."

---

7. "Metastasis" means "the development of secondary malignant growths at a distance from a primary site of cancer." THE NEW OXFORD AMERICAN DICTIONARY 1074 (1st ed.2001).

In support of its causation argument, HCHD relies on *Bowie,* where the plaintiff alleged that a hospital's physician's assistant misread or misplaced an x-ray and, therefore, did not discover that the plaintiff had fractured her foot. *Bowie,* 79 S.W.3d at 50. Approximately one month later, the plaintiff's orthopedic surgeon discovered the fractured foot. *Id.* The plaintiff filed an expert report, which stated that had the x-ray been properly read, she "would have had the possibility of a better outcome." *Id.* at 51. The supreme court, after recognizing that a report need not use any particular magical words, held that the trial court could have reasonably determined that the report did not represent a good-faith effort to summarize the causal relationship. *Id.* at 53. The court noted that the report simply opined that the plaintiff had a "possibility of a better outcome," and did not sufficiently "[link] the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the hospital's] alleged breach (that it did not correctly read and act upon the x-rays)." *Id.*

Here, in contrast, Dr. McWilliams opined in his expert report that HCHD's breach of its standard of care permitted Garrett's cancer to advance and metastasize. *See Linan v. Rosales,* 155 S.W.3d 298, 305–06 (Tex.App.-El Paso 2004, pet. denied) (affirming verdict in favor of plaintiff for doctor's failure to timely diagnose cancer based on evidence that during two-month period cancer "involved the lymph vessels" and caused edema and that advancement of cancer eliminated option of breast conserving therapy); *In re Barker,* 110 S.W.3d 486, 491 (Tex.App.-Amarillo 2003, no pet.) (finding expert report stating that negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries to be sufficient). McWilliams further noted in his report that as a result of the failure to timely inform Garrett of her cancer, Garrett, in July 2005, presented herself at LBJ's emergency room with a six month history of pain and swelling in her breast. Furthermore, McWilliams opined that the failure to timely inform Garrett of her diagnosis eliminated the availability of effective diagnostic measures and therapeutic options.

We conclude that Dr. McWilliams, in his report, provided a fair summary of the causal relationship between HCHD's failure to meet the pertinent standard of care and the Garretts' damages. Accordingly, we hold that the trial court did not err in denying HCHD's motion to dismiss the health care liability claims of the Garretts' on the ground that McWilliams's report does not show that HCHD's conduct actually caused the Garretts' any damages.

We overrule HCHD's sole issue.

## Conclusion

We affirm the order of the trial court.