Opinion issued March 18, 2010 


















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-09-00883-CV
__________
 
CLEAR LAKE REHABILITATION HOSPITAL, L.L.C., Appellant
 
V.
 
LILY KARBER, Appellee
 

 
 
On Appeal from the 164th District Court
Harris County, Texas
Trial Court Cause No. 2009-45845
 

 
 
MEMORANDUM OPINION
          In this interlocutory appeal,


 appellant, Clear Lake Rehabilitation Hospital,
L.L.C. (“Clear Lake”), challenges the trial court’s order denying its motion to dismiss
the health care liability claims of appellee, Lily Karber. In two issues, Clear Lake
contends that Karber’s physician’s expert report is “inadequate with respect to
causation” because her expert is “unqualified to opine on the causal relationship”
between the breach of the standard of care and Karber’s injuries and the expert’s
opinion on causation is “speculative and conclusory.”
          We affirm the order of the trial court.
Background
          In her original petition, Karber, who is eighty-one years old, alleges that she
fell and sustained a fractured leg while receiving rehabilitative care at Clear Lake,
which was negligent in failing to provide adequate nursing services, treatment plans,
supervision, and assistive devices. She asserts that Clear Lake’s negligence
proximately caused her injuries, which included the fractured leg and, ultimately, the
amputation of the leg due to an infection that developed after an operation to repair
the fracture.
          In support of her claims, Karber timely served upon Clear Lake the expert
report of Richard Evans, M.D.


 In his report, Evans detailed his qualifications as
follows:
As my attached CV describes, I am a physician licenced in the State of
Texas. I received my . . . Doctor of Medicine and Master of Science
(physiology and immunology) degrees from Tulane University School
of Medicine in New Orleans. I pursued speciality training in general
surgery at the University of California School of Medicine, San
Francisco and at Stanford University School of Medicine in Palo Alto. 
I completed general surgery training at St. Joseph Hospital in Houston. 
This included training at the University of Texas M.D. Anderson Cancer
Center and a one year fellowship in surgical oncology . . . . 
Evans explained that the goal of his practice is to reduce deformity caused by surgery
and noted that he has published more than fifty articles and letters in medical
journals, which he identifies and describes in his curriculum vitae. In his curriculum
vitae, Evans stated that he had previously engaged in the private practice of general
surgery from 1978 to 1988 and has since been engaged in the fields of physical
medicine and medical writing. Evans is also certified by the American Board of
Surgery.
          In his report, Evans explained that he has “had hands on experience in hospitals
and [has] provided medical care to patients similar to [Karber]” and, through his
experience, education, and training, he is familiar with the nursing standards of care
applicable to the case. In preparing his report, Evans reviewed Karber’s medical
records from Clear Lake and multiple other medical facilities and the expert report
of Suzanne Frederick, R.N., who had also opined that Clear Lake had breached the
applicable standards of care by failing to supervise staff to ensure that Karber was
properly transferred. Evans, based upon his review of all of the documents and
records, opined that Clear Lake breached the applicable standards of care and that
these breaches caused Karber’s injuries. 
          Specifically, Evans noted that Karber, who had fallen at her home and fractured
her left femur, underwent an open reduction and internal fixation (ORIF) of her left
femur at a third-party hospital. Karber was thereafter admitted into Clear Lake for
rehabilitation and physical therapy. In regard to the treatment and care that she had
received at Clear Lake, Evans stated,          [Clear Lake’s] Pre-Admission screening form showed that
[Karber] required maximum assistance with toileting and transfers. . . .
The physician’s orders stated no weight bearing on the left leg and foot.
. . . The records show that [Karber] required total assistance with
transfers and two (2) helpers for safety due to her left femur fracture and
immobilizer. The physical therapist documented that [Karber] was
unable to control her left lower extremity during transfers. She was
assessed to be at risk for falls.
 
          A physician’s progress notice on 4/2/08 . . . stated, “[patient] fell
and heard a ‘pop’ when she transferred to her room one hour ago. Has
some discomfort now.” He wrote to have an x-ray in the morning. The
nurse’s notes do not mention this transfer event. On 4/3/08 the
physician’s progress note reflected that [Karber] was transferring to the
wheelchair and inadvertently put weight on her left lower extremity and
stated she twisted it and heard a “pop.” The note further states that the
x-ray showed that the fixation had come apart and there was valgus
deformity with the fixation posteriorly and that she needed to see an
orthopedic surgeon in the morning. A subsequent physician’s note
stated that there was a re-injury to the left femur around the previous
ORIF. She was transferred [back] to the hospital . . . on 4/4/08. 
According to Dr. Rosenblatt’s Discharge Summary, [Karber] stated she
was transferring out of her wheelchair but the wheelchair technician
stated that she was transferring off of the bedside commode, “but
nonetheless, she put weight on her left leg and had a twisting type
motion what the patient described and heard a pop.” [Karber] fractured
her left femur a second time, because of the weight she had to place on
her injured leg. If she had received the assistance of two nurses to help
her it is unlikely that this new injury would have occurred.
 
          [Karber] had to have a second operation to repair this fracture. 
There was a resulting wound infection, which ultimately involved the
bone. The osteomyelitis was not cured despite aggressive treatment
with intravenous antibiotics and local wound care. [Karber] ultimately
required an above the knee amputation of her leg.
  
          It is my opinion, based on my education, training and experience
that the deviation from the standard of care proximately caused the
injury to [Karber’s] left leg and the subsequent sequala including
infection and ultimately amputation. 
 
Standard of Review
          We review a trial court’s decision on a motion to dismiss a health care liability
claim for an abuse of discretion. See Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (predecessor statute); Gray v. CHCA
Bayshore L.P., 189 S.W.3d 855, 858 (Tex. App.— Houston [1st Dist.] 2006, no pet.). 
A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner
without reference to guiding rules or principles. See Garcia v. Martinez, 988 S.W.2d
219, 222 (Tex. 1999). When reviewing matters committed to the trial court’s
discretion, we may not substitute our own judgment for that of the trial court. Bowie
Mem’l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse
its discretion merely because it decides a discretionary matter differently than an
appellate court would in a similar circumstance. Gray, 189 S.W.3d at 858; Harris
County Hosp. Dist. v. Garrett, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.]
2007, no pet.). 
            Expert Report 
          In two issues, Clear Lake argues that the trial court abused its discretion in
denying its motion to dismiss Karber’s claims because Evans’s expert report is
“inadequate with respect to causation.” Clear Lake asserts that Evans is “unqualified
to opine on the causal relationship” between the breach of the standard of care and
Karber’s injuries. It also asserts that Evans’s causation opinions are “speculative and
conclusory” and provide no explanation of the causal relationship between the breach
and Karber’s injuries.
          A plaintiff bringing a health care liability claim must provide each defendant
health care provider with an expert report or voluntarily nonsuit the action. See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2009); Gray, 189 S.W.3d at
858. The expert report must provide a fair summary of the expert’s opinions as of the
date of the report regarding the applicable standards of care, the manner in which the
care rendered by the health care provider failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages claimed.


 See Tex.
Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). An “expert,” “with respect to a person
giving opinion testimony about the causal relationship between the injury, harm, or
damages claimed and the alleged departure from the applicable standard of care in
any health care liability claim,” must be “a physician who is otherwise qualified to
render opinions on such causal relationship under the Texas Rules of Evidence.” Id. 
§ 74.351(r)(5)(C); see also id. § 74.403(a) (Vernon 2005) (“[I]in a suit involving a
health care liability claim against a physician or health care provider, a person may
qualify as an expert witness on the issue of the causal relationship between the
alleged departure from accepted standards of care and the injury, harm, or damages
claimed only if the person is a physician and is otherwise qualified to render opinions
on that causal relationship under the Texas Rules of Evidence.”). Under the Texas
Rule of Evidence, “[i]f scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education may
testify thereto in the form of an opinion or otherwise.” Tex. R. Evid. 702; see also
Broders v. Heise, 924 S.W.2d 148, 153 (Tex. 1996).
          If a plaintiff timely serves an expert report, a defendant may file an objection
challenging the sufficiency of the report not later than the 21st day after the date it
was served. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). If a defendant files
a motion to dismiss challenging the adequacy of the expert report, the trial court shall
grant the motion to dismiss only if it appears to the court, after a hearing, that the
report does not represent an objective good-faith effort to comply with the definition
of an expert report. Id. § 74.351(b), (l). The only information relevant to the inquiry
is that within the four corners of the document. Palacios, 46 S.W.3d at 878. 
Although the plaintiff need not marshal all of her proof in the report, the report must
include the expert’s opinion on each of the elements identified in the statute. See
Palacios, 46 S.W.3d at 878–79; Gray, 189 S.W.3d at 859. In setting out the expert’s
opinions, the report must provide enough information to fulfill two purposes to
constitute a good-faith effort. Palacios, 46 S.W.3d at 879. First, the report must
inform the defendant of the specific conduct the plaintiff has called into question. Id. 
Second, the report must provide a basis for the trial court to conclude that the claims
have merit. Id. A report that merely states the expert’s conclusions does not fulfill
these two purposes. Id. The expert must explain the basis of his statements to link
his conclusions to the facts. Bowie, 79 S.W.3d at 52. However, a plaintiff need not
present evidence in the report as if she were actually litigating the merits. Palacios,
46 S.W.3d at 879. Furthermore, the report can be informal in that the information in
the report does not have to meet the same requirements as the evidence offered in a
summary judgment proceeding or trial. Id. 
Qualifications to Opine on Causation
          Clear Lake argues that Evans is not qualified to opine on causation because
there is nothing in Evans’s curriculum vitae or report to establish that he actually
cares for or treats patients in a rehabilitation setting like that at Clear Lake or that he
is knowledgeable “about the care and treatment of fractures.” Clear Lake asserts that
Evans lacks the expertise to opine on “the causal relationship between the occurrence
of [Karber’s] second fracture of the left femur and the above-knee amputation she
later underwent” and the “progression” of Karber’s second fracture “from its
occurrence to the point of requiring amputation.” Clear Lake complains,
          [Evans] does not explain or identify any experience he has caring
for patients with multiple comorbidities who have an initial fracture and
subsequent surgery with the placement of hardware, followed by a
subsequent fracture and surgery, and ultimately amputation. As a
surgical oncologist, he does not repair fractured femurs and does not
perform amputations, and there is nothing in his report or CV to suggest
he makes decisions about what care and treatment is indicated when a
patient with a prior ORIF develops infection. In addition, nowhere is
there any explanation of how there might be similarities between the
care he renders as a surgical oncologist and that provided to [Karber] for
her fractures.
 
Clear Lake asserts that there is no evidence that Evans “could directly opine on how
and why [Karber] required an amputation of her left leg.” 
          Clear Lake encourages us to focus on Evans’s qualifications to opine on events
that occurred subsequent to Karber’s fall, i.e., the subsequent surgery, care, infection,
and amputation. However, Karber’s claims are not so limited. In his report, Evans 
primarily focused upon Clear Lake’s alleged negligence in failing to provide Karber
with adequate assistance, resulting in Karber placing weight upon her leg, falling, and
fracturing her leg. Evans, based upon his review of Karber’s medical records,
concluded that Karber fell as a result of Clear Lake’s inadequate assistance, Karber
felt a “popping” in her leg upon falling or placing weight on her leg, and Karber
fractured her leg as a result of the fall. Evans did not opine that there was any
negligence associated with the subsequent surgical repair of Karber’s fracture, the
development, progression, or treatment of Karber’s infection, or the ultimate
amputation and the care provided to Karber thereafter. Clear Lake, in its argument
about Evans’s qualifications, ignores the fact that Evans opined on the causal
connection between Karber’s fall and fracturing of her leg.  
          Thus, we focus on whether the trial court could have determined that Evans is
qualified to provide expert testimony that Clear Lake’s inadequate assistance caused
Karber’s fall and fracture.


 Evans’s curriculum vitae and report reveal that he is
Texas-licensed physician, he has Doctor of Medicine and Master of Science degrees
in physiology and immunology, he has completed speciality training in general
surgery and obtained certification by the American Board of Surgery, he engaged in
the practice of general surgery from 1978–1988, and he has been engaged in the field
of physical medicine and medical writing since 1988. Evans also stated in his report
that he has “hands on experience in hospitals and has provided medical care to
patients similar to [Karber].” We conclude that the trial court acted within its
discretion in determining that Evans is qualified to opine on the causal connection
between Clear Lake’s negligence in failing to provide Karber adequate assistance and
Karber’s fall and the resulting fracturing of her leg.


 See Azle Manor, Inc. v. Vaden,
No. 2-08-115-CV, 2008 WL 4831408, at *9 (Tex. App.—Fort Worth Nov. 6, 2008,
no pet.) (mem. op.) (stating that trial court could have reasonably concluded that
expert was qualified “to render a causation opinion as simple and straightforward as
the one in this case”). 
          In support of its argument that Evans is unqualified to render an opinion on
causation,


 Clear Lake cites Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996). In
Broders, the supreme court considered the qualifications of an emergency physician
to testify about the cause of death of a patient with a brain injury. Id. at 151, 153. 
The expert “never testified that he knew, from either experience or study, the
effectiveness” of the treatments that he contended should have been provided to the
patient. Id. at 153. The supreme court concluded that the expert’s opinion about the
effectiveness of such treatments was “mere speculation” and would not assist the jury
and, thus, held that the trial court did not abuse its discretion in excluding the expert’s
testimony. Id.  
          Here, unlike in Broders, Evans’s opinions on causation cannot be characterized
as mere speculation. Based upon his review of the medical records, which themselves
mandated that Karber was not to place weight on her left leg, Evans opined that,
contrary to these mandates, Clear Lake’s provision of inadequate assistance put
Karber in the position of placing weight on her left leg, which caused her to fall and
break her leg. The trial court could have reasonably concluded that Evans, a
practicing physician with a significant history in surgery, was qualified to review
Karber’s medical records and determine that the fracture of her leg in the course of
her fall was caused by the inadequate assistance of Clear Lake.


 
Causation
          Clear Lake argues that Evans’s expert opinions regarding causation are 
conclusory because they require “the inference that if [Karber] was assisted by two
nurses she would not have re-fractured the left femur.” Clear Lake asserts that
“assuming that [Karber] was assisted by only one individual, it is within the realm of
possibility that even if two nurses were involved in the transfer, [Karber] could have
still placed weight on her left leg and incurred the additional fracture that would have
required amputation.” 
          An expert report must provide only a fair summary of the expert’s opinions
regarding the causal relationship between the failure of the health care provider to
provide care in accord with the pertinent standard of care and the injury, harm, or
damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). Evans clearly
stated in his report that Clear Lake’s own screening form indicated that Karber
required “maximum assistance” with transfers, Karber’s physician’s orders stated “no
weight bearing on the left leg and foot,” other records showed that Karber required
“total assistance with transfers” and two helpers for safety, and Karber’s physical
therapist documented that Karber could not control her left lower extremity during
transfers. Evans also clearly stated that Karber’s medical records showed that she fell
and heard a ‘pop’” during a transfer after putting “weight on her left lower
extremity,” a subsequent x-ray revealed that “the fixation had come apart,” and
Karber “needed to see an orthopedic surgeon in the morning.” Other physician notes
confirmed that Karber experienced a “pop” after placing weight on her left leg. 
Based upon his review of these medical records, Evans opined that Karber had
fractured her left femur a second time as a result of placing weight on her injured leg
and, if she had received adequate assistance from two nurses, “it is unlikely that this
new injury would have occurred.” 
          Although Clear Lake complains that Evans’s opinions are conclusory and
speculative, the pertinent facts, as articulated by Evans, are straightforward. Indeed,
if Evans has fairly described Karber’s medical records in his report, these records
themselves provide evidence of a casual connection between Karber’s fall and her
fracture. Evans cited in his report the significant documentation detailing Karber’s
needs for assistance and mandating the provision of two nurses to Karber during
transfers. Clear Lake does not challenge the expert opinions of Evans and Frederick
that Clear Lake breached the applicable standards of care by failing to ensure that
Karber was transferred with the assistance of two nurses. Clear Lake’s argument that
it “is within the realm of possibility” that Karber would have been injured, even if she
had been provided additional assistance, misses the point. In his report, Evans was
only required to explain the basis of his statements and to link his conclusions to the
facts. Bowie, 79 S.W.3d at 52. We conclude that the trial court acted within its
discretion in determining that Evans, in his report, provided a fair summary of the
causal relationship between Clear Lake’s alleged failure to provide adequate
assistance and Karber’s injuries.


 
          Accordingly, we hold that the trial court did not err in denying Clear Lake’s
motion to dismiss Karber’s health care liability claims on the ground that Evans’s
report was inadequate with respect to causation. 
          We overrule Clear Lake’s first and second issues. 
Conclusion
          We affirm the order of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Jennings, Hanks, and Bland.