

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00812-CV

**CHOICE CLINICAL LAB, LLC** d/b/a Greenleaves Diagnostics Laboratories, LLC,
Appellant

v.

Olga Roman **ROBERTS**, Individually and as Independent Executor of the Estate of Aubrey
Roberts, Deceased and Grace Robinson, Abigail Roberts and Aubrey Roberts, III Individually,
Appellees

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2022-CI-20793
Honorable Mary Lou Alvarez, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Irene Rios, Justice
                Liza A. Rodriguez, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: August 7, 2024

AFFIRMED

Choice Clinical Lab, LLC d/b/a Greenleaves Diagnostics Laboratories, LLC ("Choice Clinical") appeals the trial court's interlocutory order overruling its objections to the Chapter 74 expert report of F.E. Saba, M.D. *See* TEX. CIV. PRAC. & REM. CODE §§ 51.014(a)(9), 74.351(b). On appeal, Choice Clinical argues the trial court erred in overruling its objections because the expert report failed to demonstrate Dr. Saba's qualifications to opine about the standard of care applicable to a laboratory testing facility like Choice Clinical. We affirm.

BACKGROUND

On October 20, 2022, Olga Roman Roberts, individually and as independent executor of the Estate of Aubrey Roberts, Grace Robinson, Abigail Roberts, and Aubrey Roberts, III ("the Roberts Plaintiffs") sued Choice Clinical and Coronado Continuing Care Center Ltd. Co. d/b/a Coronado at Stone Oak ("Coronado") for negligence arising out of the death of Aubrey Roberts. Their live petition alleges that on March 8, 2022, Aubrey Roberts was admitted to Methodist Stone Oak Hospital to treat injuries after a fall. He underwent surgery to repair an "acute right femoral neck fracture." On March 11, 2022, he was discharged to Coronado for rehabilitation and therapy. At the time of his admission to Coronado, he had been diagnosed with unspecified dementia, allergic rhinitis, vitamin deficiency, history of falls, insomnia, shortness of breath, flaccid neuropathic bladder, mild protein-calorie malnutrition, Alzheimer's disease, retention of urine, dysphagia, COPD, constipation, and recent fracture of femur. His day-to-day care was provided by Coronado. While at Coronado, he developed a urinary tract infection ("UTI").

The staff at Coronado took urine and blood samples from Aubrey Roberts and sent them to Choice Clinical for testing. Aubrey Roberts was given antibiotics "pending culture" from Choice Clinical; however, those antibiotics were ineffective. The Roberts Plaintiffs allege that test results on the samples taken from Aubrey Roberts revealed the presence of Morganella Morganii bacteria and that Choice Clinical did not send these results to Coronado until April 13, 2022. Roberts died on April 16, 2022.

The Roberts Plaintiffs further allege that Choice Clinical was negligent in failing to timely communicate the lab results, in failing to perform a timely evaluation of samples taken from Roberts, and in failing to follow-up the chain of command to ensure timely lab results were performed and communicated. The Roberts Plaintiffs allege that these acts were a proximate cause of Roberts's injuries and death.

The Roberts Plaintiffs timely served their Chapter 74 expert report and curriculum vitae of F.E. Saba, M.D. In response, Choice Clinical objected to the report on the grounds that it did not show Dr. Saba's qualifications to testify about the standard of care applicable to a testing laboratory. The trial court overruled its objections, and this interlocutory appeal followed.

## CHAPTER 74 EXPERT REPORT

On appeal, Choice Clinical argues that the trial court erred in overruling its objections to Dr. Saba's expert report because the expert report does not show Dr. Saba's qualifications to testify about the standard of care applicable to a testing laboratory. Chapter 74 of the Texas Civil Practice and Remedies Code requires a claimant who asserts a "health care liability claim" against a "physician or health care provider" to "serve on each defendant one or more expert reports describing the expert's opinions addressing the applicable standards of care, how the defendant's conduct failed to meet those standards, and how those failures caused the claimant's injury, harm, or damages." *Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 836 (Tex. 2022) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6)). If a plaintiff timely files an expert report, a defendant may then file an objection challenging the sufficiency of the report. TEX. CIV. PRAC. & REM. CODE § 74.351(a). The trial court shall grant a motion to dismiss only if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id*. § 74.351(l). "An expert report demonstrates a 'good faith effort,' and is sufficient under the statute, when it '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *E.D. by & through B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693-94 (Tex. 2018)). We determine whether the expert report is adequate by considering "the four corners of the report, taken as a whole." *Id*. We

review the trial court's ruling under an abuse-of-discretion standard; thus, "[c]lose calls must go to the trial court." *Id*. (quoting *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006)).

The expert report under chapter 74 "inform[s] the defendant of the specific conduct the plaintiff has called into question and . . . provide[s] the trial court with a basis to determine whether the plaintiff's claims have merit." *Ramsay v. Ferguson*, No. 07-23-00392-CV, 2024 WL 769537, at *2 (Tex. App.—Amarillo Feb. 23, 2024, no pet. h.) (citing *Patel v. Williams*, 237 S.W.3d 901, 906 (Tex. App.—Houston [14th Dist.] 2007, no pet.)). Thus, "the purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation"; the purpose is "not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex 2018) (per curiam).

"[W]ith respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care," an "expert" is a person "qualified to testify under" section 74.402. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(B). Section 74.402, in turn, provides that a person may qualify as an expert if the person (1) "is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose"; (2) "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim"; and (3) "is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *Id*. at § 74.402(b). "In determining whether an expert is qualified on the basis of training or experience," the trial court considers whether the witness (1) "is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim"; and (2) "is actively

practicing health care in rendering health care services relevant to the claim." *Id*. § 74.402(c). "A person offering an expert report must establish that he has expertise regarding 'the specific issue before the court which would qualify the expert to give an opinion on that particular subject.'" *Ramsay*, 2024 WL 769537, at *2 (quoting *In re Windisch*, 138 S.W.3d 507, 512 (Tex. App.—Amarillo 2004, orig. proceeding)). "The analysis is focused on 'the very matter' on which the expert is to give an opinion." *Id*. (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)).

Choice Clinical argues that Dr. Saba's report does not show he is qualified to testify about the standard of care applicable to a testing laboratory because Dr. Saba does not run or direct a testing laboratory and is not a pathologist. However, to be qualified to testify in this case, Dr. Saba does not need to run a laboratory or be a pathologist. *See Zamora-Quezada v. Mendoza*, No. 13-17-00302-CV, 2018 WL 1755877, at *3 (Tex. App.—Corpus Christi-Edinburg Apr. 12, 2018, pet. denied). "A physician who does not specialize in the same area of medicine as the defendant is competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant." *Id*. (citing *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003); *Gelman v. Cuellar*, 268 S.W.3d 123, 128 (Tex. App.—Corpus Christi 2008, pet. denied)). "Nevertheless, not every licensed doctor is automatically qualified to testify on every medical question." *Id*. (citing *Broders*, 924 S.W.2d at 152). "Thus, the trial court's inquiry should not focus on the specialty of the medical expert." *Id*. (citing *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 749-50 (Tex. App.—El Paso 2011, no pet.)). "Instead, the trial court should look to 'whether the offering party has established that the expert has knowledge, skill, experience, training or education regarding the specific issue before the court.'" *Id*. (quoting *Gelman*, 268 S.W.3d at 128). "Therefore, a medical expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different specialty under circumstances similar to those at issue in the case."

*Love*, 347 S.W.3d at 750 (citing *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)).

For example, in *Harris County Hospital District v. Garrett*, 232 S.W.3d 170, 173 (Tex. App.—Houston [1st Dist.] 2007, no pet.), the plaintiff sued the hospital district for negligence, alleging that it failed to notify her of pathology findings showing breast cancer, which resulted in a significant delay in her treatment and advancement of her cancer. The hospital district objected to the plaintiff's expert report, arguing that the expert report failed to show that the expert, a board certified OBGYN, was qualified to testify about the standard of care applicable to the hospital district's laboratory. *Id*. at 178. The court of appeals rejected the hospital district's argument that the expert report must show the physician possessed expertise "on the operation of a major metropolitan hospital's records systems or pathology labs." *Id*. The court of appeals concluded that the expert report adequately established the physician's expertise in "the same type of care or treatment as that delivered by" the hospital district, had "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim," and was "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *Id*. Thus, the court of appeals held that "the trial court did not err in denying [the hospital district]'s motion to dismiss the health care liability claims . . . on the grounds that . . . [the physician] did not establish his credentials as an expert 'on the operation of a major metropolitan hospital's records systems or pathology labs.'" *Id*. at 178-79.

Here, Dr. Saba's expert report, and accompanying curriculum vitae, describe his education, training, and experience in detail. Dr. Saba is a licensed physician in Florida, "a diplomat of the American Board of Internal Medicine," and has been "board certified in hospice and palliative care." According to the expert report, he "actively practic[es] as a physician providing direct care

to patients, similar to Aubrey Roberts." His "primary experience is in primary medical care, skilled nursing facilities, post-acute care, hospital care, long-term acute care, assisted-living facilities, and pharmacy and therapeutics." He is currently "a medical director at multiple skilled nursing and long-term care facilities, and a corporate medical director for St. Anthony's Hospital and Kindred Hospital-St. Petersburg." He also "currently teach[es] medicine at Northside Hospital and Heart Institute-Pinellas Park, and Largo Medical Center." Dr. Saba is also "a consulting physician for Windmoor Healthcare/Psychiatric Hospital and practice at Healthsouth/Encompass Rehabilitation." Dr. Saba "work[s] as a physician and CEO for Professional Health Care of Pinellas, LLC, a multispecialty group." Additionally, Dr. Saba "served as [a] member of the Pharmacy and Therapeutics Committee, consulting on many pharmacy and therapeutics cases." Further, "[a]s medical director, physician supervisor, and a quality assurance member to many facilities," Dr. Saba has "overseen and consulted on proper standard[s] of care in long-term care facilities."

Based on the above education, training, and experience, the expert report states that Dr. Saba is qualified to render opinions on the standard of care applicable to Coronado, "specifically concerning the medical management of patients, such as Aubrey Roberts," and "the standard of care for reporting lab results to healthcare providers." With regard to his "background as to the standard of care for labs providing results to healthcare providers," Dr. Saba points to his experience as a nursing home medical director. The expert report further explains that Dr. Saba is "familiar with the accepted standards of medical care applicable to the nursing staff in the long-term care setting" and is "familiar with types of problems experienced by Aubrey Roberts, including but not limited to choking, being overly medicated, pressure ulcer injuries, UTI, septic shock, and subsequent death." The expert report also points to Dr. Saba's education, training, and

experience as the basis for his qualifications to "testify as an expert about medical causation in the case of Aubrey Roberts."

Dr. Saba's expert report describes in detail Aubrey Roberts's condition at the time he was admitted to Coronado and his decline during his stay at Coronado, which eventually resulted in his death. The report notes that during his stay at Coronado, Aubrey Roberts appeared "to be suffering from symptoms consistent with UTI and septic shock" and appeared to be "encephalopathic with decreased urine output and fever." His "catheter was exchanged, producing 2 liters of purulent fluid from the new catheter." He then "became hypotensive and unresponsive," and "died shortly thereafter." Dr. Saba's expert report explains the cause of Aubrey Roberts's death:

> According to the assessments performed[,] Mr. Roberts's primary impression included septic shock and UTI in the context of the in-dwelling catheter (the etiology of the UTI is noted to be the catheter). Labs were consistent with his primary impression: Leukocytosis of 20.4; Acute renal failure – creatinine of 5.4; Hypokalemia of 3.2; Hypernatremia of 153; and elevated troponin. The autopsy's principal diagnosis is consistent with septic shock resulting from UTI: bladder dilation; acute and chronic cystitis; dilation of distal right ureter; edema and acute inflammation of left kidney; 4 chamber cardiac hypertrophy and dilation; features consistent with acute tubular necrosis.

With respect to the standard of care that applied to Choice Clinical, Dr. Saba's expert report explains that upon receiving Aubrey Roberts's lab results on April 8, 2022, the standard of care was for Choice Clinical "to report the results immediately to the requesting provider, Coronado." According to Dr. Saba's expert report, the medical records show Aubrey Roberts's lab results were not communicated to the attending physician or Coronado until after 5 p.m. on April 13, 2022. The expert report states that Choice Clinical's delay in reporting the lab results resulted in a "significant delay in ordering the correct medication to treat the bacterial infection." Because of this delay, Aubrey Roberts did not receive the correct antibiotics until April 14, 2022. Dr. Saba's expert report concludes that Choice Clinical "breached the standard of care when it failed to timely communicate the lab results [on April 8, 2022]."

Dr. Saba's expert report further states how the breaches of care by Coronado and Choice Clinical caused Aubrey Roberts's death:

> As a result of the breaches of the standard of care as described above[,] Mr. Roberts suffered from choking, over medication, and UTI, which was allowed to fester without sufficient care and treatment until it resulted in septic shock and his subsequent cardiac arrest, hypotensive state, and death. It is my opinion to a reasonable degree of medical certainty that Mr. Roberts's death resulted from his substandard care and were caused by the Coronado at Stone Oak nursing staff and [Choice Clinical] as described above. Had the standard of care been met as described above within a reasonable degree of medical certainty[,] Mr. Roberts would have received the proper attention and care he deserved and survived.

Based on Dr. Saba's expert report, we conclude he is qualified to serve as an expert on the issue of whether Choice Clinical departed from the accepted standard of care in regard to the Roberts Plaintiffs' claims. His expert report established that he actively practices healthcare as a physician providing direct care to patients like Aubrey Roberts and is familiar with the types of medical problems suffered by Aubrey Roberts that caused his death. The expert report points to his experience as a medical director at multiple skilled nursing and long-term care facilities as a basis for his knowledge of the standard of care applicable to Choice Clinical. The report also notes that Dr. Saba is a teacher at two medical institutions and has "served as [a] member of the Pharmacy and Therapeutics Committee, consulting on many pharmacy and therapeutics cases." While Choice Clinical argues in its brief that "Dr. Saba baldly asserts he is familiar with the standard of care applicable to a testing laboratory because he is a medical director for nursing homes," this argument fails to give credit to the expert report as a whole document. The expert report describes in detail Dr. Saba's practical experience in treating and handling medical cases like the one presented with Aubrey Roberts and his knowledge in how the laboratory should have reported the results in cases such as those. *See Broders*, 924 S.W.2d at 153 (explaining that the focus of the analysis should be whether the expert has "knowledge, skill, experience, training, or education" "regarding the specific issue before the court which would qualify the expert to give

an opinion on that particular subject"). Additionally, his *curriculum vitae* contains five pages of Dr. Saba's research experience relating to lab drugs and their efficacy on numerous conditions, reflecting approximately eighteen years of lab research experience. We therefore conclude the trial court did not abuse its discretion in determining that Dr. Saba was qualified to give his expert opinion regarding the standard of care applicable to Choice Clinical. *See* TEX. CIV. PRAC. & REM. CODE § 74.402(b)-(c); *Moore v. Gatica*, 269 S.W.3d 134, 141-42 (Tex. App.—Fort Worth 2008, pet. denied) (rejecting argument that in order to show the physician was qualified in the case the expert report must specifically state that the physician had experience in performing laparoscopic appendectomies and holding that the expert report adequately demonstrated that the physician had "knowledge, skill, experience, training, or education regarding the specific issue before the trial court—the proper conclusion of an appendectomy"); *see also Garrett*, 232 S.W.3d at 178-79.

## CONCLUSION

Because the expert report sufficiently showed Dr. Saba was qualified to give his expert opinion regarding the standard of care applicable to Choice Clinical, we hold the trial court did not abuse its discretion in overruling Choice Clinical's objections to Dr. Saba's expert report. We therefore affirm the trial court's order.

Liza A. Rodriguez, Justice