ACCEPTED
01-12-01108-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/22/2015 4:21:32 PM
CHRISTOPHER PRINE
CLERK

**NO. 01-12-01108-CV**

**IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
AT HOUSTON**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/22/2015 4:21:32 PM
CHRISTOPHER A. PRINE
Clerk

**TELICIA OWENS,**
*Appellant*,

**V.**

**KRISTA G. HANDYSIDE, M.D.; *ET AL.*,**
*Appellees*.

**On Appeal from the 152nd Judicial District Court of Harris County, Texas
Trial Court Cause No. 2012-07534**

**KENNETH A. TOTZ, D.O., FACEP'S MOTION FOR REHEARING**

Charles B. Holm
State Bar No. 09900300
Kyle M. Smith
State Bar No. 24054226
Holm Bambace LLP
1010 Lamar Street, Suite 1100
Houston, Texas 77002
(713) 652-9700 – Telephone
(713) 652-9702 – Facsimile
cholm@holmbambace.com
ksmith@holmbambace.com

**ATTORNEYS FOR APPELLEE,
KENNETH A. TOTZ, D.O., FACEP**

**POINT ONE**

In its April 23, 2015 Opinion (the "Opinion"), the First Court of Appeals (the "Court") erred by failing to explain *how* the 152nd Judicial District Court of Harris County, Texas (the "Trial Court") abused its discretion when it dismissed Appellant, TELICIA OWENS' ("Appellant") health care liability claim against Appellee, KENNETH A. TOTZ, D.O., FACEP ("Dr. Totz"), with prejudice on September 6, 2012.

Although the Opinion cites the correct standard of appellate review – abuse of discretion – for the Trial Court's decision on a motion to dismiss a health care liability claim, the Opinion is completely silent as to *how* this Court determined that the Trial Court abused its discretion when it dismissed Appellant's health care liability claim against Dr. Totz with prejudice on September 6, 2012.

The Trial Court's factual determination of lack of proper "service" was guided by the legal principles established by this Court in *Gutierrez*, as well as the Fourteenth Court of Appeals in *Nexion Health*. *See University of Texas Health Science Center at Houston vs. Gutierrez*, 237 S.W.3d 869, 872 (Tex. App. – Houston [1[st] Dist.] 2007, pet. denied); *Nexion Health at Beechnut, Inc. v. Paul*, 335 S.W.3d 716, 718 (Tex. App. – Houston [14[th] Dist.] 2011, no pet.). The Trial Court was required to follow these rulings, because as a Harris County District Court, it must follow the legal authority of this Court and the Fourteenth Court of Appeals. Conversely, the Trial Court had no controlling legal authority before it that would support a determination that Dr. Totz's attorney, Charles B. Holm's ("Mr. Holm") acquisition of an expert report, by any means other than Rule 21a "service," waived the Section 74.351(a) requirement of "service."

This Court erred by finding that the Trial Court abused its discretion, without explaining *how* the Trial Court arrived to its decision in an arbitrary or unreasonable manner, without reference to guiding rules or principles. By doing so, the Court substituted its own judgment for that of the Trial Court, thereby using a "de novo," standard of appellate review, as opposed the required abuse of discretion standard, to review the Trial Court's decision, which this Court was not allowed to do.

## POINT TWO

In its Opinion, the Court erred by reaching a decision regarding service of Appellant's May 9, 2012 Expert Report, which was prepared by Brian C. Richardson, M.D. ("Dr. Richardson's May 9th Expert Report"), that is in direct conflict with a previous decision reached by this Court, as well as decisions reached the Texas Supreme Court and several other Texas Courts of Appeal.

Specifically, in *Gutierrez*, this Court determined that Texas Rule of Civil Procedure 21a service is required in order to fulfill the requirements of Texas Civil Practice & Remedies Code § 74.351(a).  *Gutierrez*, 237 S.W.3d at 872; *see also Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011); *Zanchi v. Lane*, 408 S.W.3d 373, 380 (Tex. 2013); *Nexion Health*, 335 S.W.3d at 718.

## POINT THREE

In its Opinion, the Court erred by misinterpreting the Texas Supreme Court's holding in the *Zanchi* opinion regarding service of an expert report, *i.e.*, Dr. Richardson's May 9th Expert Report.

Specifically, the *Zanchi* opinion only concluded that the formal requirements Texas Rule of Civil Procedure 106 service with citation are not required in order to fulfill the requirements of Texas Civil Practice & Remedies Code § 74.351(a).  *Zanchi* did not overturn the requirement of Texas Rule of Civil Procedure 21a service in order to fulfill the requirements of Texas Civil Practice & Remedies Code § 74.351(a), which was the holding of this Court in *Gutierrez*.

## POINT FOUR

This Court's ruling that service of an expert report in compliance with Rule 21a is not required for compliance with Section 74.351(a) is in direct conflict with this Court's own jurisprudence and Section 74.351(a)'s clear and unambiguous requirement that an expert report must be "served" on each party or the party's attorney, pursuant to Rule 21a, within 120 days of filing suit.  This Court determined in *Gutierrez* that "service" means Texas Rule of Civil Procedure 21a service, and it also determined that compliance

with Texas Civil Practice & Remedies Code § 74.351(a) is mandatory for a health care liability claim to proceed.

# TABLE OF CONTENTS

Points Presented for Review............................................................................. i

Index of Authorities .................................................................................... v

Arguments and Authorities.......................................................................... 1

A.    Point One.......................................................................................... 1

B.    Point Two......................................................................................... 4

C.    Point Three ...................................................................................... 7

D.    Point Four ...................................................................................... 10

Conclusion and Prayer.............................................................................. 13

Certificate of Service................................................................................ 14

Certificate of Compliance.......................................................................... 15

Appendix.................................................................................................. 16

First Court of Appeals' April 23, 2015 Opinion ....................................... Tab A

# INDEX OF AUTHORITIES

## Cases

*Amaya v. Enriquez*, 296 S.W.3d 781 (Tex. App. – El Paso 2009, pet. denied)............................................................................................. 4, 8

*American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873 (Tex. 2001) ................................................................. 1

*Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48 (Tex. 2002) ................... 2

*Breiten v. Shatery*, 365 S.W.3d 829 (Tex. App. – El Paso 2012, no pet.)...... ................................................................................................ 5, 8

*Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855 (Tex. App. – Houston [1st Dist.] 2006, no pet.) ................................................................. 1

*Harris County Hospital District v. Garrett*, 232 S.W.3d 170 (Tex. App. – Houston [1st Dist.] 2007, no pet.)................................................... 2

*Herrera v. Seton Northwest Hospital*, 212 S.W.3d 452 (Tex. App. – Austin 2006, no pet.)........................................................................... 4, 8

*Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010) ........................................ 2

*Kendrick v. Garcia*, 171 S.W.3d 698 (Tex. App. – Eastland 2005, pet. denied).............................................................................................. 4, 8

*Mathis v. Lockwood*, 166 S.W.3d 743 (Tex. 2005) .................................. 5, 9

*Nexion Health at Beechnut, Inc. v. Paul*, 335 S.W.3d 716 (Tex. App. – Houston [14th Dist.] 2011, no pet.)................................................ i-ii, 2-4, 8

*Otero v. Alonzo*, No. 13-10-00304-CV, 2011 Tex. App. LEXIS 1559 (Tex. App. – Corpus Christi, Mar. 3, 2011, no pet. h.) (mem. op.) ..................... 4, 8

*Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011) .... ii, 4-5, 8, 11-12

*Strobel v. Marlow*, 341 S.W.3d 470 (Tex. App. – Dallas 2001, no pet.) ......... .................................................................................................4-5, 8

*University of Texas Health Science Center at Houston v. Gutierrez*, 237 S.W.3d 869 (Tex. App. – Houston [1st Dist.] 2007, pet. denied) ............. .............................................................................. i-ii, 2-5, 8, 11-12

*Zanchi v. Lane*, 408 S.W.3d 373, 380 (Tex. 2013) ...................... ii, 4-5, 7-10

**Statutes**

Texas Civil Practice & Remedies Code § 74.351(a) ......... i-iii, 3-5, 7-8, 10-13

Texas Civil Practice & Remedies Code § 74.351(b) ............................ 11-12

Texas Code of Criminal Procedure 59.04(b) ................................................7

**Rules**

Texas Rule of Appellate Procedure 49.1 ...................................................... 1

Texas Rule of Civil Procedure 21a ................................................. i-ii, 3-12

Texas Rule of Civil Procedure 106 .................................................. ii, 7, 9

## KENNETH A. TOTZ, D.O., FACEP'S MOTION FOR REHEARING

TO THE HONORABLE FIRST COURT OF APPEALS:

Dr. Totz submits this Motion for Rehearing ("Motion") pursuant to Texas Rule of Appellate Procedure 49.1, in response to the Court's Opinion (attached hereto at Tab "A" of the Appendix), and respectfully requests that the Court order a rehearing on its Opinion, as follows:

## ARGUMENTS AND AUTHORITIES

### A.    POINT ONE

**In its Opinion, the Court erred by failing to explain *how* the Trial Court abused its discretion when it dismissed Appellant's health care liability claim against Dr. Totz with prejudice on September 6, 2012.**

Although the Opinion cites the correct standard of appellate review – abuse of discretion – for the Trial Court's decision on a motion to dismiss a health care liability claim, the Opinion is completely silent as to *how* the Court determined that the Trial Court abused its discretion when it dismissed Appellant's health care liability claim against Dr. Totz with prejudice on September 6, 2012. *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App. – Houston [1st Dist.] 2006, no pet.). In its Opinion, this Court erred by finding that the Trial Court abused its discretion, without explaining *how* the Trial Court's decision was

1

arbitrary or unreasonable, or without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

As the Clerk's Record clearly demonstrates, Dr. Totz challenged proper service of Dr. Richardson's May 9th Expert Report, Appellant never filed any written response or contradictory evidence to Dr. Totz's challenge and evidence, and the Trial Court heard evidence and arguments from counsel on this issue at an August 24, 2012 oral hearing. Whether the Appellant properly served Dr. Richardson's May 9th Expert Report on Dr. Totz or Dr. Totz's attorney, Mr. Holm, was a purely factual issue, which the Trial Court determined did not happen, which was within its discretion. When reviewing matters committed to a trial court's discretion, an appellate court may not substitute its own judgment for that of the trial court. *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). Further, a trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris County Hospital District v. Garrett*, 232 S.W.3d 170, 176 (Tex. App. – Houston [1st Dist.] 2007, no pet.).

The Trial Court's factual determination of lack of proper "service" was guided by the legal principles established by this Court in *Gutierrez*, as well as the Fourteenth Court of Appeals in *Nexion Health*. *Gutierrez*,

237 S.W.3d at 872; *Nexion Health*, 335 S.W.3d at 718. Further, the Trial Court was required to follow these rulings, because as a Harris County District Court, it must follow the legal authority of this Court and the Fourteenth Court of Appeals. Conversely, the Trial Court had no controlling legal authority before it that would support a determination that Dr. Totz's attorney, Mr. Holm's acquisition of Dr. Richardson's May 9th Expert Report, by any means other than Rule 21a "service," waived the Section 74.351(a) requirement of "service."

As explained above, whether or not Dr. Richardson's May 9th Expert Report was properly served on Dr. Totz or Dr. Totz's attorney, Mr. Holm, was a fact question, which the Trial Court had the discretion to decide. After the presentation of oral arguments and evidence on August 24, 2012, the Trial Court determined that proper service pursuant to Texas Rule of Civil Procedure 21a was not accomplished, and dismissed Appellant's health care liability claim against Dr. Totz with prejudice on September 6, 2012.

In its Opinion, this Court overturned the Trial Court's ruling, but it did not explain *how* the Trial Court abused its discretion, or *how* the Trial Court arrived to its decision in an arbitrary or unreasonable manner, without reference to guiding rules or principles. In doing so, this Court substituted

3

its own judgment for that of the Trial Court, thereby using a "de novo," standard or appellate review, as opposed the required abuse of discretion standard, to review the Trial Court's decision, which as explained above, this Court is not allowed to do.

## B.  POINT TWO

**In its Opinion, the Court erred by reaching a decision regarding service of Dr. Richardson's May 9th Expert Report that is in direct conflict with a previous decision reached by this Court, as well as decisions reached by the Texas Supreme Court and several other Texas Courts of Appeal.**

In *Gutierrez*, this Court determined that Texas Rule of Civil Procedure 21a service is required in order to fulfill the requirements of Texas Civil Practice & Remedies Code § 74.351(a), and this has also been the holding of the Texas Supreme Court and several other Texas Courts of Appeal. *Gutierrez*, 237 S.W.3d at 872; *Nexion Health*, 335 S.W.3d at 718; *Stockton*, 336 S.W.3d at 615; *Zanchi*, 408 S.W.3d at 380; *Kendrick v. Garcia*, 171 S.W.3d 698, 703-04 (Tex. App. – Eastland 2005, pet. denied); *Amaya v. Enriquez*, 296 S.W.3d 781, 783 (Tex. App. – El Paso 2009, pet. denied); *Herrera v. Seton Northwest Hospital*, 212 S.W.3d 452, 459 (Tex. App. – Austin 2006, no pet.); *Otero v. Alonzo*, No. 13-10-00304-CV, 2011 Tex. App. LEXIS 1559, at *7 (Tex. App. – Corpus Christi, Mar. 3, 2011, no pet. h.) (mem. op.); *Strobel v. Marlow*, 341 S.W.3d 470, 475-76 (Tex. App. –

4

Dallas 2001, no pet.); *Breiten v. Shatery*, 365 S.W.3d 829, 832 (Tex. App. – El Paso 2012, no pet.).

Specifically, this Court stated in its *Gutierrez* opinion, "Given the applicability of the Rules of Civil Procedure to health care liability claims, and the use of 'serve' and 'served' in the statute, we determine that the Legislature intended for claimants to comply with rule 21a to fulfill the requirements of section 74.351(a)." *Gutierrez*, 237 S.W.3d at 872.

Texas Rule of Civil Procedure 21a authorizes service by one of four methods of delivery: (1) in person, by agent, or by courier receipted delivery; (2) by certified or registered mail to the party's last known address; (3) by telephonic document transfer to the recipient's current telecopier number; or (4) by such other manner as the court in its discretion may direct. TEX. R. CIV. P. 21a; *Zanchi*, 408 S.W.3d at 380 at fn.4.; *Stockton*, 336 S.W.3d at 615. Notice properly sent pursuant to Texas Rule of Civil Procedure 21a raises a presumption that notice was received, but when such service is challenged, the burden of proof shifts to the sender of the notification or document to demonstrate proper service. *Mathis v. Lockwood*, 166 S.W.3d 743, 745 (Tex. 2005).

Dr. Totz denied that he was served with Dr. Richardson's May 9th Expert Report, and Dr. Totz's attorney, Mr. Holm, also denied that he was

5

served by the Appellant, and merely explained that he had "obtained a copy of Dr. Richardson's [May 9th] Expert Report through alternative means." Dr. Totz challenged Appellant's assertion of proper service of Dr. Richardson's May 9th Expert Report pursuant to Rule 21a, and by doing so, shifted the burden of proof regarding Rule 21a service to the Appellant. As the Clerk's Record clearly demonstrates, Appellant never provided or filed any arguments or evidence to contradict Dr. Totz's assertion that Dr. Richardson's May 9th Expert Report was not properly served pursuant to Rule 21a. The Trial Court heard evidence and arguments from counsel on this very issue and properly concluded that the Appellant had not met her burden regarding proper Rule 21a service of Dr. Richardson's May 9th Expert Report on Dr. Totz or Dr. Totz's attorney, Mr. Holm.

After hearing the arguments and evidence presented to it at the August 24, 2014 oral hearing, the Trial Court properly determined that proper Rule 21a service of Dr. Richardson's May 9th Expert Report was not completed on Dr. Totz or Dr. Totz's attorney, Mr. Holm, and dismissed Appellant's health care liability claim against Dr. Totz with prejudice on September 6, 2012. This was proper and supported by the aforementioned case law, and was within the Trial Court's discretion to do so.

## C.    POINT THREE

**In its Opinion, the Court erred by misinterpreting the Texas Supreme Court's holding in the *Zanchi* opinion regarding service of an expert report.**

The *Zanchi* opinion only concluded that the formal requirements of Rule 106 service with citation are not required in order to fulfill the requirements of Texas Civil Practice & Remedies Code § 74.351(a). *Zanchi*, 408 S.W.3d at 381 ("We further hold that an expert report need not be 'served' in compliance with the formal requirements of Rule 106 that apply specifically to service of citation."). Specifically, in *Zanchi*, the Texas Supreme Court wrote:

> In Zanchi's second issue, he argues that in order to "serve" an expert report on a defendant who has not yet been served with process, the claimant must comply with the service-of-citation requirements under Texas Rule of Civil Procedure 106. We disagree. Rule 106 by its terms applies solely to service of citation. TEX. R. CIV. P. 106. If the Legislature had intended to require a claimant to serve an expert report in accordance with Rule 106, it clearly knew how to do so. *See, e.g.*, TEX. CODE CRIM. PROC. ART. 59.04(b) (requiring that, to institute civil forfeiture proceedings, the state's attorney "shall cause certified copies of the notice to be served … in the same manner as provided for the service of process by citation in civil cases."). We need not decide whether service in a manner other than that authorized by Rule 21a satisfies the [Texas Medical Liability Act's] requirement to "serve" an expert report because, here, Zanchi,

7

> does not dispute either that Lane sent the expert report on the statutory deadline, via certified mail, or that Zanchi actually received the expert report." *See* TEX. R. CIV. P. 21a.

*Zanchi*, 408 S.W.3d at 380.

As quoted above, it is clear that the *Zanchi* opinion did not overturn the requirement of Rule 21a service in order to fulfill the requirements of Texas Civil Practice & Remedies Code § 74.351(a), which was the holding of this Court in *Gutierrez*, the Texas Supreme Court, as well as several additional Texas Courts of Appeal. *See Zanchi*, 408 S.W.3d at 380; *Gutierrez*, 237 S.W.3d at 872; *Nexion Health*, 335 S.W.3d at 718; *Kendrick*, 171 S.W.3d at 703-04; *Amaya*, 296 S.W.3d at 783; *Herrera*, 212 S.W.3d at 459; *Otero*, 2011 Tex. App. LEXIS 1559, at *7; *Strobel*, 341 S.W.3d at 475-76; *Breiten*, 365 S.W.3d at 832.

Texas Rule of Civil Procedure 21a authorizes service by one of four methods of delivery: (1) in person, by agent, or by courier receipted delivery; (2) by certified or registered mail to the party's last known address; (3) by telephonic document transfer to the recipient's current telecopier number; or (4) by such other manner as the court in its discretion may direct. TEX. R. CIV. P. 21a; *Zanchi*, 408 S.W.3d at 380 at fn.4.; *Stockton*, 336 S.W.3d at 615. Notice properly sent pursuant to Texas Rule

8

of Civil Procedure 21a raises a presumption that notice was received, but when such service is challenged, the burden of proof shifts to the sender of the notification or document to demonstrate proper service. *Mathis*, 166 S.W.3d at 745.

As clearly demonstrated above, the *Zanchi* opinion did not overrule the requirement of Rule 21a service of Dr. Richardson's May 9th Expert Report on Dr. Totz or Dr. Totz's attorney, Mr. Holm; rather, it only held that the Rule 106 service of citation requirement is not required with regard to the service of an expert report in a health care liability claim. That said, Rule 21a allows for several forms of service, as outlined above, in order to be in compliance with Rule 21a. Dr. Totz denied that he was served with Dr. Richardson's May 9th Expert Report, and Dr. Totz's attorney, Mr. Holm, also denied that he was served by the Appellant, and merely explained that he had "obtained a copy of Dr. Richardson's [May 9[th]] Expert Report through alternative means." Dr. Totz challenged Appellant's assertion of proper service of Dr. Richardson's May 9th Expert Report, and by doing so, shifted the burden of proof regarding Rule 21a service to the Appellant. As the Clerk's Record clearly demonstrates, Appellant never provided any proof to contradict Dr. Totz's assertion that Dr. Richardson's May 9th Expert Report was not properly served pursuant to Rule 21a. Further, the Trial

9

Court heard evidence on this very issue and also properly concluded that the Appellant had not met her burden regarding proper Rule 21a service of Dr. Richardson's May 9th Expert Report on Dr. Totz or Dr. Totz's attorney, Mr. Holm.

As demonstrated above, the *Zanchi* opinion, along with this Court's jurisprudence, as well as several other Texas Courts of Appeal's jurisprudence, Rule 21a service of Dr. Richardson's May 9th Expert Report was required for Appellant to proceed with her health care liability claim against Dr. Totz. Such Rule 21a service was not properly accomplished, and as such, the Trial Court's September 6, 2012 decision to dismiss Appellant's health care liability against Dr. Totz must be affirmed.

### D. **POINT FOUR**

**In its Opinion, this Court erred by holding that "service" of Dr. Richardson's May 9th Expert Report was accomplished because Dr. Totz's attorney stated that he had "obtained a copy of Dr. Richardson's [May 9th] Expert Report through alternative means."**

The ruling in this Court's Opinion that service of an expert report in compliance with Rule 21a is not required for compliance with Section 74.351(a) is in direct conflict with this Court's own jurisprudence and Section 74.351(a)'s clear and unambiguous requirement that an expert report must be "served" on each party or the party's attorney within 120

10

days of filing suit pursuant to Rule 21a. *Gutierrez*, 237 S.W.3d at 873; *Stockton*, 336 S.W.3d at 615. This Court determined in *Gutierrez* that "service" means Texas Rule of Civil Procedure 21a service, and it also determined that compliance with Texas Civil Practice & Remedies Code § 74.351(a) is mandatory for a health care liability claim to proceed. *Gutierrez*, 237 S.W.3d at 873. A claimant **_must_** comply with Texas Civil Practice and Remedies Code § 74.351(a), when asserting a health care liability claim. *Id.* (emphasis added). Among the statute's requirements is the expert report requirement, which directs a claimant to "serve" an expert report and the expert's curriculum vitae on each party or party's attorney within 120 days of filing suit. *Gutierrez*, 237 S.W.3d at 872-73; *Stockton*, 336 S.W.3d at 615; TEX. CIV. PRAC. & REM. CODE § 74.351(a).[1] Compliance with this provision is **_mandatory_**, the claimant **_must serve_** an expert report to proceed with a health care liability claim. *Gutierrez*, 237 S.W.3d at 872-73; *Stockton*, 336 S.W.3d at 615; TEX. CIV. PRAC. & REM. CODE § 74.351(a), (b). If the claimant has not served an expert report by the statutory

---

[1] In 2013, the Texas Legislature amended Section 74.351 of the Texas Medical Liability Act. *See* Act of May 26, 2013, 83rd Leg. R.S., ch. 870, § 2, 2013 TEX. SESS. LAW SERV. 2220, 2220. The new provision applies to lawsuits filed after September 1, 2013. Because Appellant filed her Original Petition in 2010, the former version of Section 74.351 is applicable to her claims. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 TEX. GEN. LAWS 1590, 1590 (Amended 2013) (current version at Texas Civil Practice & Remedies Code § 74.351).

11

deadline, and the parties have not agreed to extend that deadline, which did not happen in this matter, and subject to an exception, which is not applicable in this matter, dismiss the health care liability claim with prejudice. *Gutierrez*, 237 S.W.3d at 872; *Stockton*, 336 S.W.3d at 615; TEX. CIV. PRAC. & REM. CODE § 74.351(b).

This Court determined in *Gutierrez* that "service" means Texas Rule of Civil Procedure 21a service, and compliance with Texas Civil Practice & Remedies Code Section § 74.351(a) is mandatory for a health care liability claim to proceed. Although Dr. Totz's attorney, Mr. Holm, admittedly "obtained a copy of Dr. Richardson's [May 9th] Expert Report through alternative means," such report was not "served" on said counsel pursuant to Texas Rule of Civil Procedure 21a. Further, Appellant never presented any evidence to demonstrate that Dr. Totz was served with Dr. Richardson's May 9th Expert Report pursuant to Texas Rule of Civil Procedure 21a. As such, and based upon the aforementioned case law and statutory language, Appellant did not fulfill her mandatory requirement to proceed with her health care liability claim against Dr. Totz. This Court's ruling to the contrary in its Opinion contradicts Texas Supreme Court jurisprudence, as well as this Court's very own jurisprudence, when

12

interpreting the intent and requirements of Texas Civil Practice & Remedies Code § 74.351(a).

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Dr. Totz prays that the Court grant this Motion for Rehearing of the April 23, 2015 Opinion, withdraw the aforementioned April 23, 2015 Opinion, and affirm the Trial Court's September 6, 2012 decision to dismiss Appellant's health care liability claim against Dr. Totz with prejudice. Dr. Totz also prays for all other and further relief, both in law and in equity, to which he may be justly entitled.

Respectfully submitted,

**HOLM BAMBACE LLP**

By: */s/ Charles B. Holm*
Charles B. Holm
State Bar No. 09900300
Kyle M. Smith
State Bar No. 24054226
1010 Lamar, Suite 1100
Houston, Texas 77002
(713) 652-9700 – Telephone
(713) 652-9702 – Facsimile
cholm@holmbambace.com
ksmith@holmbambace.com

**ATTORNEYS FOR APPELLEE,
KENNETH A. TOTZ, D.O., FACEP**

13

## CERTIFICATE OF SERVICE

This will certify that pursuant to Texas Rule of Appellate Rule 9.5, a true and correct copy of the above and foregoing Dr. Totz's Motion for Rehearing was forwarded to the following counsel of record *via* e-file, e-mail, and facsimile on **Monday, June 22, 2015**:

Reginald E. McKamie, Sr.
Law Office of Reginald E. McKamie, Sr., P.C.
1210 Antoine Drive, Suite 100
Houston, Texas 77055
***Via e-File***
***Via e-Mail: reginaldmckamie@gmail.com***
***Via Facsimile: (713) 465-2894***

Frank A. Doyle
Gabe A. Sassin
Myers Doyle
7676 Woodway Drive, Suite 350
Houston, Texas 77063
***Via e-File***
***Via e-Mail: fdoyle@myersdoyle.com***
***gsassin@myersdoyle.com***
***Via Facsimile: (713) 278-9163***

Richard M. Law
Angela M. Nolan
Stephanie A. Sanders
Smith Adams Law Feehan, LLP
1415 Louisiana Street, Suite 3800
Houston, Texas 77002
***Via e-File***
***Via e-Mail: Richard@smithadamslaw.com***
***Angela@smithadamslaw.com***
***Stephanie@smithadamslaw.com***
***Via Facsimile: (713) 652-6000***

*/s/ Charles B. Holm*
Charles B. Holm

14

## **CERTIFICATE OF COMPLIANCE**

This will certify that pursuant to Rule of Appellate Procedure 9.4(i)(3), the foregoing Dr. Totz's Appellee's Motion for Rehearing complies with Texas Rule of Appellate Procedure 9.4(i)(2)(B)'s word-count limitation for computer-generated documents.  Specifically, the undersigned certifies that Dr. Totz's Motion for Rehearing contains 3,668 words.

*/s/ Charles B. Holm*
Charles B. Holm

**APPENDIX**

1.    First Court of Appeals' April 23, 2015 Opinion ............................. Tab A

# Tab A

Opinion issued April 23, 2015



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-01108-CV

———————————

**TELICIA OWENS, Appellant**

**V.**

**KRISTA G. HANDYSIDE, M.D., SAMUEL J. PRATER, M.D., KENNETH A. TOTZ, D.O., FACEP, AND MEMORIAL HERMANN HOSPITAL SYSTEM D/B/A MEMORIAL HERMANN – TEXAS MEDICAL CENTER, Appellees**

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2012-07534

**O P I N I O N**

Appellant, Telicia Owens, challenges the trial court's dismissal of her health care liability claims[1] against appellees, Krista G. Handyside, M.D., Samuel J. Prater, M.D., Kenneth A. Totz, D.O., FACEP,[2] and Memorial Hermann Hospital System, doing business as Memorial Hermann – Texas Medical Center ("Memorial Hermann").[3] In three issues, Owens contends that the trial court erred in dismissing her claims on the grounds that she failed to timely serve her medical expert report on appellees, her medical expert is not qualified to opine on the standard of care of hospital emergency room doctors, and her report insufficiently addresses the issues of standard of care and causation.[4]

We reverse and remand.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (Vernon Supp. 2014).

[2] Owens sued "Kenneth A. Totz, M.D." We note that in his answer, Dr. Totz identifies himself as "Kenneth A. Totz, D.O., FACEP," as does the trial court in its dismissal order. Our style of the case is in accord with the trial court's dismissal order. *See Strobel v. Marlow*, 341 S.W.3d 470, 471 n.1 (Tex. App.—Dallas 2011, no pet.).

[3] Owens sued "Memorial Hermann Healthcare System d/b/a Memorial Hermann Hospital." In its answer, Memorial Hermann stated that it was incorrectly named. In its dismissal order, the trial court identifies Memorial Hermann as "Memorial Hermann Hospital System d/b/a Memorial Hermann – Texas Medical Center." Our style of the case is in accord with the trial court's dismissal order. *See id.*

[4] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2014) (governing medical expert reports). In 2013, the legislature amended section 74.351 of the Texas Medical Liability Act. *See* Act of May 26, 2013, 83rd Leg. R.S., ch. 870, § 2, 2013 TEX. SESS. LAW SERV. 2220, 2220. The new provision applies to all suits filed after September 1, 2013. Because Owens filed her original petition in 2010, we apply the former version of section 74.351 to her claims. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 TEX. GEN. LAWS 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351).

2

## Background

In her petition, Owens alleges that on February 6, 2010, she went to the "Emergency Department at Memorial Hermann," complaining of a "severe headache." She was diagnosed with a "migraine, tension headache, and headache associated with sinuses[,]" and "[n]o diagnostic testing was done to rule out any internal problems." On February 10, 2010, Owens "returned to the Emergency Department at Memorial Hermann," complaining of "the same persisting symptoms." Dr. Handyside diagnosed her as suffering from a "headache and sinitus." Again, no diagnostic testing was performed. On February 21, 2010, Owens "returned again to the [E]mergency [D]epartment at Memorial Hermann," complaining of a "headache and blurry vision." Drs. Prater and Totz treated her, and they diagnosed her as suffering from a "headache." Again, no diagnostic testing was performed.

Subsequently, on February 24, 2010, Owens went to "Methodist Hospital for assessment of the same symptoms that she complained of at Memorial Hermann." Doctors administered a "CT scan," which showed that she was suffering from a "head bleed." Methodist admitted Owens into its Intensive Care Unit, and it discharged her on March 3, 2010.

On April 22, 2010, Owens went to "Ben Taub General Hospital[,] complaining of sudden blindness, which resulted in [the] placement of a lumbar

3

shunt." On May 14, 2010, she returned to Ben Taub, "complaining of sutures coming out, shunt leak[age], blurred vision, and [a] headache." Ben Taub admitted Owens for evaluation and subsequently discharged her. On May 17, 2010, Owens again returned to Ben Taub, "complaining of [a] headache, chest pain, and neck stiffness." Her shunt was infected, and it was removed. Owens was "found to have been infected with MRSA—Methicillin Resistant Staphyloccus Auereus."

Owens further alleges that she sustained "permanent damage to her optic nerve and is completely blind in both of her eyes. She has continuous subsequent damage and pain." However, Owens does not specify in her petition the medical cause or reason for her loss of vision and residual "damage and pain."

Owens brings health care liability claims against Drs. Handyside, Prater, and Totz for negligence and gross negligence, specifically alleging that they:

- Failed to obtain an accurate assessment of Owens;

- Failed to notice signs and symptoms of "Cerebral Venous Sinus Thrombosis" ("CVST");

- Failed to accurately and timely diagnose Owens;

- Failed to consider possible explanations and respond to severe headaches and blurry vision;

- Failed to order appropriate radiological studies;

- Failed to make a medical diagnosis based on Owens's clinical condition;

4

- Failed to consult with a neurologist or other specialist while Owens was in the emergency department;

- Failed to develop and carry out a proper treatment plan for Owens;

- Failed to admit Owens to "Neurological ICU";

- Failed to order thrombolytic medication necessary to attempt to dissolve thrombosis;

- Failed to adhere to "Federal Laws regarding EMTALA regarding emergently treating a patient" regardless of her inability to pay;

- Failed to order appropriate diagnostic tests and treatments even once "cerebral venous sinus thrombosis" was suspected as a possible cause of Owens's symptoms; and

- Negligently managed a patient with CVST.

Owens likewise brings direct-liability claims for negligence and gross negligence against Memorial Hermann, specifically alleging that it:

- Failed to select and retain only competent physicians and staff;

- Failed to properly supervise the health care providers who treated Owens;

- Failed to enforce or have in place policies, protocols, by-laws, rules and regulations regarding proper diagnosis and treatment of Owens's medical condition;

- Failed to enforce or have in place policies and protocols, with regard to consulting specialty physicians;

- Failed to have a medical director or chief of staff in place that properly supervised physicians and staff; and

- Failed to abide by recommendations and requirements of healthcare certifying organizations.

"As a result of the above-noted acts of negligence," Owens asserts that appellees "directly and proximately caused" her "injuries, losses, and damages." She also alleges that Memorial Hermann is vicariously liable for the negligent "acts and/or omissions" of its staff, including, among others, Drs. Handyside, Prater, and Totz.

To support her claims, Owens, on or about May 29, 2012, filed and served upon appellees a medical expert report authored by Brian C. Richardson, M.D. Appellees objected to Dr. Richardson's report on several grounds, including that Owens did not timely serve it; it failed to sufficiently address the elements of standard of care, breach of the standard, and causation; and Richardson, a neurologist, is not qualified to opine on the standard of care of hospital emergency room doctors or causation. Dr. Totz filed his objection to the sufficiency of Richardson's report on June 19, 2012.

Owens, on July 17, 2012, filed her response to the objections of appellees, attaching United States Postal Service ("USPS") certified mail receipts and "green cards," which evidence service of Dr. Richardson's expert report on appellees by certified mail. However, the signature line on the green card for Dr. Totz does not contain a signature, and both the USPS certified mail receipt and green card pertaining to him show the wrong zip code for his home address. On August 15, 2012, Totz filed a "Supplemental Objection" to Richardson's expert report,

attaching to it his affidavit and the affidavit of his attorney, Charles B. Holm. Totz testified that he had "never received a copy of Dr. Richardson's Expert Report *via* certified mail, return receipt requested at [his] personal residence" and he "never executed" the green card attached to Owens's response. Although Holm testified that he had "never received a copy of Dr. Richardson's Expert Report from the Plaintiff or her attorney on or before June 6, 2012," and neither had anyone at his law firm, he conceded that he had "obtained a copy of Dr. Richardson's Expert Report though alternative means." Owens did not file a response to Totz's supplemental objection.

After a hearing, the trial court sustained Dr. Totz's specific objection that Owens had failed to timely serve him with Dr. Richardson's expert report, and it dismissed Owens's claims against him. It also sustained the objections of Memorial Hermann and Drs. Handyside and Prater as to the adequacy of Richardson's expert report, but it allowed Owens thirty days to file and serve upon them an amended report.

Owens then filed and served Dr. Richardson's amended medical expert report on Memorial Hermann and Drs. Handyside and Prater. In Richardson's amended report, he notes that he is a "physician in private practice," is "licensed to practice medicine in the State of California," and is "board certified in adult neurology and vascular neurology." Richardson further states:

7

> I have knowledge of accepted and established standards of medical care for the patient[']s diagnosis that is involved in the claim. I obtained this knowledge via my residency and fellowship training as well as via experience[] gained in the practice of neurology for over 19 years.
>
> . . . .
>
> As a neurologist board certified in general adult neurology and vascular neurology[,] I have seen, diagnosed and managed many patients with dural sinus thrombosis. I have also seen, diagnosed and managed patients with idiopathic intracranial hypertension (formerly referred to as pseudotumor cerebri or benign intracranial hypertension). As such[,] I am familiar with the standard of care for the diagnosis, care and treatment of both dural sinus thrombosis and idiopathic intracranial hypertension.

Richardson also explains that he reviewed Owens's medical records prior to forming his opinions.

Dr. Richardson notes that the applicable standard of care for Dr. Handyside, concerning a patient complaining of,

> a severe headache of one week duration . . . without a prior history of recurrent headaches would include cerebral imaging[,] such as [a] CT or preferably [a] brain MRI. [A] [l]umbar puncture should have been performed as well. A neurology consultation should have been obtained. It should have been clear to the examining physician that the patient had a potentially serious neurological condition. The differential diagnosis should have included dural sinus thrombosis. The standard of care would also have included admission or urgent appropriate outpatient follow-up . . . .

In regard to the applicable standard of care for Dr. Prater, Richardson states the following:

[Owens was diagnosed with] rule out cavernous sinus thrombosis, rule out meningoenchephalitis. . . . These are two very serious diagnoses that should have prompted admission to the hospital and [an] urgent neurological consultation. At the very least[,] neurodiagnostic studies[,] such as [a] lumbar puncture, [a brain CT], or [a] brain MRI[,] should have been performed. The standard of care for evaluating patients with possible meningitis is to perform a lumbar puncture right away. Neurological consultation and neuroimaging[,] such as [a brain CT scan] or [a] brain MRI[,] should be done promptly when cavernous sinus thrombosis is being entertained as a diagnosis. Patients should be admitted to the hospital rather than discharged when life-threatening diagnoses such as these are considered. . . . As stated above, cerebral imagining, [a] CT or preferably [a] brain MRI[,] should have been done. A lumbar puncture should have been performed given the diagnoses of the examining physicians.

Finally, regarding the applicable standard of care for Memorial Hermann, Richardson notes that it "should have had protocols for evaluation, consultation, admission and follow-up that resulted in adequate care of patients with conditions such as dural sinus thrombosis and idiopathic intracranial hypertension. The failure to have in place and abide by such protocols was a bre[a]ch in the standard of care."

In regard to causation, Dr. Richardson opines that,

If Dr. . . . Handyside had performed cerebral imaging[,] such as [a] CT or preferably [an] MRI, performed [a] lumbar puncture or obtained [a] neurological consultation it is medically probable that . . . Owens would have had her condition diagnosed and treated in a timelier manner. Early treatment of dural sinus thrombosis reduces the likelihood of complications[,] such as idiopathic intracranial hypertension. Thus[,] her vision would have most likely been spared and she would not have lost vision in the right and left eyes. Severe loss of vision is a preventable complication of dural sinus thrombosis.

9

If Dr[]. . . . Prater performed [a] lumbar puncture, ordered cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admitted [Owens to the hospital] and/or obtained [a] neurological consultation, . . . Owens would have likely had a more timely diagnosis, earlier treatment and her vision would medically probably have been saved. If . . . Prater had not prescribed dexamethazone for . . . Owens[,] it is medically probable that her condition would not have been exacerbated. It is possible she would have not progressed to . . . have [a] loss of vision.

. . . .

Memorial Herman[n] . . . failed to have and/or implement adequate protocols for evaluation, consultation, admission and follow-up that resulted in adequate care of this patient with dural sinus thrombosis and idiopathic intracranial hypertension. The failure to have in place and abide by such protocols was a bre[a]ch in the standard of care that was a proximate cause of . . . Owens subsequently developing blindness in the right and left eyes.

(Footnote omitted.) Richardson further opines that:

. . . Owens developed dural sinus thrombosis . . . . This is an uncommon, but well known condition that is treatable with anticoagulant medications. There was a significant delay in the diagnosis of this condition. This delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early.

And he explains that: "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension. Idiopathic intracranial hypertension may progress to blindness if untreated. It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss." (Footnote omitted.)

10

Memorial Hermann and Drs. Handyside and Prater objected to Dr. Richardson's amended medical expert report and moved to dismiss Owens's claims against them on the grounds that Richardson is not qualified to opine on the standard of care for hospital emergency room doctors and his report insufficiently addresses the issues of standard of care and causation. Drs. Handyside and Prater also reasserted their untimeliness objections. Without stating its reasons, the trial court granted the motions of Memorial Hermann and Drs. Handyside and Prater to dismiss Owens's health care liability claims.

**Standard of Review**

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an

11

appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

**Timeliness of Expert Report**

In her first issue, Owens argues that the trial court erred in dismissing her claims against Dr. Totz because he admitted in his objection, filed on June 19, 2012, to Dr. Richardson's report that he had timely received the report and he did not raise his timeliness objection "until August 15, 2012, more than two months after the expiration of the 120-day deadline." Totz argues that Owens "failed to preserve her argument regarding [his] admission" of his timely receipt of Richardson's expert report because she did not "ever raise [in the trial court] the argument that [he] admitted that he was timely served" with the report.

The former version of section 74.351 of the Texas Civil Practice and Remedies Code, in effect at the time this suit was filed, provided that a health care liability claimant shall, "not later than the 120th day after the date the original petition [is] filed, serve on each party or the party's attorney one or more expert reports."[5] *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 TEX. GEN. LAWS 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2014)). It further provided that if an expert

---

[5]     The legislature's 2013 amendment to section 74.351(a) requires each health care liability claimant to serve an expert report "not later than the 120th day after *each defendant's original answer* is filed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (emphasis added).

report is not timely served, the affected health care provider may move to dismiss a claim asserted against it, and the court must dismiss the claim with prejudice. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *Heriberto Sedeno, P.A. v. Mijares*, 333 S.W.3d 815, 818, 822–23 (Tex. App.—Houston [1st Dist.] 2010, no pet.). A health care provider may waive its right to complain about the adequacy of an expert report by failing to challenge the report's adequacy within twenty-one days of service of the report. *See* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 TEX. GEN. LAWS 1590, 1590 (amended 2013) (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)); *Ogletree v. Matthews*, 262 S.W.3d 316, 321–22 (Tex. 2007). However, there is no deadline to file a motion to dismiss for failure to timely serve a chapter 74 expert report. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003); *Heriberto*, 333 S.W.3d at 823–24. In other words, a health care provider does not waive its right to dismissal of an untimely expert report by waiting to file its motion to dismiss. *See Jernigan*, 111 S.W.3d at 156–57 (waiting more than 600 days to move for dismissal). Accordingly, we hold that Dr. Totz did not waive his right to complain about the timeliness of Owens's service of Dr. Richardson's report.

Regarding Dr. Totz's argument that Owens "failed to preserve her argument regarding [his] admission" of his timely receipt of Dr. Richardson's expert report, we note that in reviewing a trial court's judgment, we may only consider what was

13

before the trial court at the time it made its decision. *San Jacinto Methodist Hosp. v. Carr*, No. 01-07-00655-CV, 2008 WL 2186473, at *3 (Tex. App.—Houston [1st Dist.] May 22, 2008, no pet.) (mem. op.); *Hansen v. Starr*, 123 S.W.3d 13, 18 (Tex. App.—Dallas 2003, pet. denied); *see also* TEX. R. APP. P. 33.1(a). As Totz noted, Owens did not respond to his supplemental objection, in which he raised the issue of the timeliness of Owens's service of Richardson's report. And, thus, she did not argue to the trial court that Totz had admitted that he had timely received Richardson's report. However, it was not necessary for her to make this assertion in her response.

Dr. Totz's attorney, Charles B. Holm, in his affidavit attached to Totz's August 15, 2012 "Supplemental Objection" to Dr. Richardson's expert report, conceded that he had "obtained a copy of Dr. Richardson's Expert Report though alternative means." His affidavit testimony does not contain an affirmative statement that he did not timely receive a copy of the report. Rather, he merely states that he "never received a copy of Dr. Richardson's Expert Report *from the Plaintiff or her attorney* on or before June 6, 2012" and neither had anyone at his law firm. (Emphasis added.) Likewise, Totz, in his affidavit, does not affirmatively state that he did not receive a copy of the report. Rather, he states that he "never received a copy of Dr. Richardson's Expert Report *via certified*

14

*mail, return receipt requested at my personal residence*" and had "never executed"

the green card attached to Owens's response to his objection. (Emphasis added.)

Importantly, neither Dr. Totz nor his attorney, in their affidavit testimony, denies having timely received a copy of Dr. Richardson's report. And the trial court, at the time it made its decision to dismiss Owens's claims against Totz, had before it Holm's testimony that he had "obtained a copy of Dr. Richardson's Expert Report though alternative means." Accordingly, we hold that Owens did not fail to preserve her argument regarding Totz's admission that he had timely received a copy of Richardson's expert report.[6]

In regard to the merits of Owens's first issue, Dr. Totz argues that the trial court did not err in dismissing Owens's claims against him because, under a proper construction of section 74.351 of the Civil Practice and Remedies Code, she had

---

[6] Dr. Totz also argues that Owens waived her "appellate issues" as to him because she did not reference in her notice of appeal the September 6, 2012 order granting Totz's motion to dismiss or serve Totz with certain documents. As explained in our April 29, 2014 order, although Owens did not list the trial court's September 6, 2012 order granting Totz's motion to dismiss in her notice of appeal, "the rules do not require [her] to list in the notice of appeal every interlocutory ruling that [she] may wish to appeal." *See Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 386 (Tex. App.—Dallas 2012, no pet.). Further, we note that "our decisions construing the appellate rules have not favored disposing of appeals on harmless procedural defects." *See Sweed v. Nye*, 323 S.W.3d 873, 875 (Tex. 2010); *see also Higgins v. Randall Cnty. Sheriff's Office*, 257 S.W.3d 684, 688 (Tex. 2008) ("[W]e have long interpreted the Rules of Appellate Procedure liberally in favor of preserving appellate rights."); *Tex. S. Univ. v. Araserve Campus Dining Servs. of Tex., Inc.*, 981 S.W.2d 929, 935 n.12 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (docketing statement does not limit or waive party's appellate arguments).

not timely served Dr. Richardson's expert report upon him, even though he had received it and was able to timely object to its sufficiency, as she had not served him by certified mail or in person. However, the Texas Supreme Court has concluded otherwise, on similar facts. *See Zanchi v. Lane*, 408 S.W.3d 373 (Tex. 2013). In *Zanchi*, the court specifically held:

> [W]e conclude, that, under section 74.351(a) of the TMLA, a physician or health care provider against whom [a health care liability claim] is asserted is a "party" who may be served with an expert report regardless of whether he has been served with process. We further hold that an expert report need not be "served" in compliance with the formal requirements of Rule 106 [governing citation and service of process] that apply specifically to service of citation.

*Id*. at 380–81.

Here, the record reveals that Owens filed her petition on February 7, 2012, naming Dr. Totz as a defendant. She then filed and served Dr. Richardson's initial expert report on the defendants on or about May 29, 2012. Although the USPS certified mail receipt and green card show that Owens used the wrong zip code in mailing the report to Totz and he was not served with the expert report in person or by certified mail, Totz and his attorney did in fact timely obtain a copy of the report "though alternative means." Accordingly, we hold that the trial court erred in granting Totz's motion to dismiss Owens's claims against him on the ground

that she had failed to timely serve him with Richardson's report. We sustain Owens's first issue.[7]

## Sufficiency of Expert Report

In her second issue, Owens argues that the trial court erred in dismissing her claims against Memorial Hermann and Drs. Handyside and Prater because "Dr. Richardson is fully qualified . . . to offer opinions in this case" and he adequately addresses the elements of standard of care and causation in his report.[8]

As noted above, a health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Gray*, 189 S.W.3d at 858. The report must provide a "fair summary" of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standard, and the causal relationship between that

---

[7] In her brief, Owens also asserts that she timely served Dr. Richardson's report on Memorial Hermann and Drs. Handyside and Prater. In response, Drs. Handyside and Prater state that they "no longer object to the timeliness of the expert report of Dr. Richardson." Similarly, in its brief, Memorial Hermann states, "[o]n or about May 30, 2012, [Owens] timely served on [Memorial Hermann] an initial expert report of Brian C. Richardson, M.D." Accordingly, we do not address this portion of Owens's first issue.

[8] Owens also asserts that Dr. Richardson's expert report adequately addresses the element of breach of the standard of care. However, neither Memorial Hermann nor Drs. Handyside or Prater objected to Richardson's report on this ground. Further, to the extent that Owens asserts that the report is sufficient in regard to Dr. Totz, we note that the trial court dismissed Owens's claims against Totz on the ground that she had not timely served him with the report. Accordingly, we do not address these portions of Owens's second issue.

17

failure and the injury, harm, or damages claimed.  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

If a defendant health care provider files a motion to dismiss, challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. *Id.* § 74.351(l); *Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011).  In setting out the expert's opinions, the report must provide enough information to fulfill two purposes:  (1) it must inform the defendant of the specific conduct that the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit.  *Scoresby*, 346 S.W.3d at 556.

### Dr. Richardson's Qualifications

Owens first argues that the trial court, to the extent that it granted Drs. Handyside's and Prater's motions to dismiss her claims on the ground that Dr. Richardson is not qualified to address the standard of care, erred because "Richardson is more than qualified to offer []his opinion."[9]  Owens asserts that it does not matter that Richardson is "not an emergency room physician" and he is

---

[9]  Memorial Hermann did not challenge Dr. Richardson's qualifications, and Drs. Handyside and Prater only assert that Richardson is not qualified to opine on the standard of care of hospital emergency room doctors.

"more than qualified to testify about dural sinus thrombosis and idiopathic intracranial hypertension, the conditions involved in [Owens's] claim[s]."

In order to qualify as an expert, an individual need not be a specialist in the particular area of the profession for which testimony is offered. *Rittger v. Danos*, 332 S.W.3d 550, 558 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). However, merely being a doctor is insufficient. *See Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). Instead, "[a] medical [expert] who is not of the same school of medicine" must show that "he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant." *Marling v. Maillard*, 826 S.W.2d 735, 740 (Tex. App.—Houston [14th Dist.] 1992, no writ); *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (doctor need not practice in particular field about which he opines if demonstrates knowledge, skill, experience, training, or education regarding specific issue before court qualifying him to give opinion on issue); *Keo*, 76 S.W.3d at 732. Analysis of an expert's qualifications to opine as an expert on the subject matter of the report is limited to the four corners of the expert report or accompanying curriculum vitae. *See Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

In order to opine on the standard of care, a person must (1) be "practicing medicine at the time such testimony is given or [have been] practicing medicine at the time the claim arose"; (2) have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim"; and (3) be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care." TEX. CIV. PRAC. & REM. CODE § 74.401(a) (Vernon 2011); *see also id.* § 74.351(r)(5)(A) (defining "expert," with respect to person opining as to whether doctor departed from accepted standards of medical care, as one "qualified to testify under the requirements of Section 74.401"). To determine whether a person is qualified on the basis of training or experience, the court shall consider whether he "is board certified or has other substantial training or experience in an area of medical practice relevant to the claim" and "is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c).

Drs. Handyside and Prater assert that "[i]n order to satisfy the expert report requirement of [c]hapter 74, [Owens] needed to serve on [them] an expert report from someone who is qualified to offer opinions on the standard of care as it relates to the care they provided, as emergency physicians." According to Drs. Handyside and Prater,

> Dr. Richardson's curriculum vitae and reports solely list his occupation as a medical doctor specializing in neurology. He also

20

lists his clinical experience as that of being in private practice. He fails to show that he has any experience in emergency medicine . . . [and] fails to show that he has ever worked in an emergency department or worked closely with emergency physicians in treating and diagnosing patients . . . .

(Internal citations omitted.)

In his expert report, Dr. Richardson notes that he is a "physician in private practice," "licensed to practice medicine in the State of California." He has been in "private practice for 19 years" and is "board certified in adult neurology and vascular neurology by the American Board of Psychiatry and Neurology." And Richardson further states:

I have knowledge of accepted and established standards of medical care for the patient[']s diagnosis that is involved in the claim. I obtained this knowledge via my residency and fellowship training as well as via experience[] gained in the practice of neurology for 19 years.

. . . .

As a neurologist board certified in general adult neurology and vascular neurology[,] I have seen, diagnosed and managed many patients with dural sinus thrombosis. I have also seen, diagnosed and managed many patients with idiopathic intracranial hypertension (formerly referred to as pseudotumor cerebri or benign intracranial hypertension). As such[,] I am familiar with the standard of care for the diagnosis, care and treatment of both dural sinus thrombosis and indiopathic intracranial hypertension.

Richardson's curriculum vitae also reveals that he is a board certified neurologist in private practice, his fellowship focused on "[c]erebral blood flow and metabolism, and dementia," he completed his residency in the field of

21

neurology, and has conducted research related to Alzheimer's disease, vascular dementia, and strokes.

In determining whether an expert is qualified, we must be careful not to draw expert qualifications "too narrowly." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006); *Adeyemi v. Guerrero*, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.). The specific issue in this case is whether Drs. Handyside and Prater failed to timely and appropriately diagnose and treat Owens's conditions.

Dr. Richardson's report shows that he has experience in treating and diagnosing patients with the conditions suffered by Owens, namely dural sinus thrombosis and idiopathic intracranial hypertension, which Drs. Handyside and Prater allegedly failed to diagnose and treat properly. And he is familiar with the standard of care applicable to doctors who care for patients with the same conditions with which Owens presented. *See Tawa v. Gentry*, No. 01-12-00407-CV, 2013 WL 1694869, at *7 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.) (expert sufficiently qualified to opine on standard of care by "showing the injury involved was of the type [the expert] treated in his practice" (internal quotation marks omitted)); *Hillery v. Kyle*, 371 S.W.3d 482, 487 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding expert qualified, where expert stated familiarity "with the standards of care relevant to the condition involved in th[e] claim" and he had "diagnosed and treated, 'patients with the

conditions similar to those experienced by'" plaintiff); *Rittger*, 332 S.W.3d at 558–59 (noting focus not on defendant doctor's area of expertise, but on condition involved in claim).

Further, we note that the fact that Dr. Richardson is a neurologist, rather than an emergency room doctor, does not disqualify him as an expert in this case. *See Rittger*, 332 S.W.3d at 559 (holding neurologist/professor of medicine qualified to opine on standard of care in case against emergency room doctor who failed to diagnose stroke in pregnant patient, explaining fact patient "was pregnant when she experienced her stroke or that she presented herself in an emergency room setting does not require that [expert] be an obstetrician or emergency room physician"); *see also Hayes v. Carroll*, 314 S.W.3d 494, 504–05 (Tex. App.—Austin 2010, no pet.) (holding doctor, board certified in general and vascular surgery, qualified to render opinion on standard of care applicable to emergency room specialist); *Blan v. Ali*, 7 S.W.3d 741, 746–47 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (concluding neurologist qualified as expert on strokes, although defendant doctors were emergency room doctor and cardiologist).

We conclude that Dr. Richardson has the knowledge, skill, experience, education, or training to render an opinion on the standard of care applicable to a doctor treating a patient with the conditions with which Owens presented. Accordingly, we hold that the trial court erred to the extent that it granted Drs.

Handyside's and Prater's motions to dismiss Owens's claims on the ground that Richardson is not qualified to opine on the standard of care.

*Causation*

Owens next argues that the trial court, to the extent that it granted Drs. Handyside's and Prater's motions to dismiss her claims on the ground that Dr. Richardson did not adequately address the issue of causation, erred because Richardson, in his report, adequately addresses the issue of causation as it related to the doctors.[10]

An expert report must provide a "fair summary" of the expert's opinions regarding the causal relationship between the failure of a health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *Wright*, 79 S.W.3d at 52. "No particular words or formality are required [in the expert report], but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556 (footnotes omitted).

---

[10] Because of our disposition of Owens's final issue below, we do not address the portion of her second issue in which she argues that the trial court erred to the extent that it granted Memorial Hermann's motion to dismiss her direct-liability claims against it on the ground that Dr. Richardson's report did not adequately address the issues of standard of care and causation. *See infra*.

A causal relationship is established by proof that a negligent act or omission constituted a substantial factor in bringing about harm and, absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). However, an expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.). The expert must simply provide some basis that the defendant health care provider's act or omission proximately caused injury. *Wright*, 79 S.W.3d at 52–53. And the expert must explain the basis of his statements and link his conclusions to the facts. *Id.* at 52. A report that merely states an expert's conclusions regarding causation is not sufficient. *Id.*; *Palacios*, 46 S.W.3d at 879. "[I]f an expert report contains only conclusions about [causation], the trial court has 'no discretion but to conclude . . . that the report does not represent a good-faith effort' to satisfy the statute." *Smith v. Wilson*, 368 S.W.3d 574, 577 (Tex. App.—Austin 2012, no pet.) (quoting *Palacios*, 46 S.W.3d at 877, 880).

In his expert report, Dr. Richardson explains:

> . . . Owens developed dural sinus thrombosis . . . . This is an uncommon, but well known condition that is treatable with anticoagulant medications. There was a significant delay in the diagnosis of this condition. This delay resulted in the development of

a complication, severe vision loss due to idiopathic intracranial hypertension.  Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early.  In the case of failure of medications, serial lumbar punctures can be done in some cases.  Surgical procedures[,] such as lumboperitoneal shunt placement[,] are effective second line treatments.  Optic nerve fenestration is an effective third level of treatment . . . .

Further, Richardson notes:  "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension.  Idiopathic intracranial hypertension may progress to blindness if untreated.  It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss."  (Footnote omitted.)

In regard to Dr. Handyside specifically, Dr. Richardson, in his report, states that she breached the standard of care "by failing to perform a fundiscopic examination and failing to perform cerebral imaging[,] such as [a] head CT or preferably [a] brain MRI."  Further, "[t]he failure to obtain a neurology consultation . . . and the failure to admit the patient if urgent follow-up could not be obtained also constitutes a bre[a]ch of the standard [of] care."  In regard to causation, Richardson opines:

> If Dr. . . . Handyside had performed cerebral imaging[,] such as [a] CT or preferably [an] MRI, performed [a] lumbar puncture[,] or obtained [a] neurological consultation[,] it is medically probable that . . . Owens would have had her condition diagnosed and treated in a timelier manner.  Early treatment of dural sinus thrombosis reduces the likelihood of complications[,] such as idiopathic intracranial hypertension.  Thus[,] her vision would have most likely been spared

26

and she would not have lost vision in the right and left eyes. Severe loss of vision is a preventable complication of dural sinus thrombosis.

(Footnote omitted.)

Dr. Handyside asserts that Dr. Richardson "merely state[s] that had [she] . . . diagnosed [Owens], then [Owens] might have had a better outcome," but fails to explain "how [her] . . . conduct caused the permanent loss of vision." In other words, Richardson "does not explain how and why the complained of delay in diagnosis and treatment . . . were substantial factors in causing [Owens's] blindness."

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the complained of injury based on the facts presented. *See Jelinek*, 328 S.W.3d at 539–40. Here, contrary to Dr. Handyside's assertions, Dr. Richardson's report does just that. Richardson opines that Handyside's failure to "perform[] cerebral imaging[,] such as [a] CT or preferably [an] MRI, perform[] [a] lumbar puncture or obtain[] [a] neurological consultation" resulted in a delay in the diagnosis and treatment of Owens's conditions. And "[t]his delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early." *Cf. Patterson v. Ortiz*, 412 S.W.3d 833, 839 (Tex. App.—Dallas 2013, no pet.) (holding sufficient report "show[ing] that performing the tests and examinations would have led to the

27

diagnosis of pneumonia and Raul's admission to the hospital, where he would have received 'early, aggressive treatment [that], more likely than not, would have saved his life'"). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.); *see also Woofter v. Benitez*, No. 01-09-00161-CV, 2009 WL 3930839, at \*7 (Tex. App.—Houston [1st Dist.] Nov. 19, 2009, no pet.) (mem. op.) ("Dr. Flye's report sets forth a chain of events involving breaches of the standard of care by each of the defendant physicians, which resulted in Islam's death.").

In regard to Dr. Prater, Dr. Richardson, in his report, states that Prater breached the standard of care by "fail[ing] to perform a lumbar puncture on [Owens]," "fail[ing] to admit her," failing to "perform cerebral imagining[,] such as [a] head CT or [a] brain MRI," failing to "obtain a neurological consultation to have [Owens] assessed urgently despite the diagnoses of possible meningoencephalitis and possible cavernous sinus thrombosis," and failing to provide "adequate neurological follow-up" after Owens was discharged from Memorial Hermann. In regard to causation, Richardson opines:

> If Dr[]. . . . Prater performed [a] lumbar puncture, ordered cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admitted [Owens to the hospital] and/or obtained [a] neurological consultation, . . . Owens would have likely had a more timely diagnosis, earlier treatment and her vision would medically probably have been saved. If . . . Prater had not prescribed dexamethazone

for . . . Owens[,] it is medically probable that her condition would not have been exacerbated. It is possible she would have not progressed to . . . have [a] loss of vision.

Further, Richardson states that "[i]f [Owens] was admitted [to the hospital], if a neurology consultation was obtained, and if a lumbar puncture had been done, it is medically probable that her condition, dural sinus thrombosis[,] would have been diagnosed earlier and her vision would have been saved with treatment." As stated above, the treatments available to prevent Owens's loss of vision are also addressed by Richardson in his report.

Dr. Prater asserts that Dr. Richardson "merely state[s] that had . . . Prater diagnosed [Owens], then she might have had a better outcome" and fails to explain "how . . . Prater's conduct caused the permanent loss of vision." In other words, Richardson "does not explain how and why the complained of delay in diagnosis and treatment and the prescription of dexamethasone were substantial factors in causing [Owens's] blindness."

Contrary to Dr. Prater's assertions, however, Dr. Richardson's report "explain[s], to a reasonable degree, how and why the [alleged] breach [by Prater] caused [Owens's] injury." *See Jelinek*, 328 S.W.3d at 539–40. Richardson opines that Prater's failure to "perform[] [a] lumbar puncture, order[] cerebral imaging[,] such as [a] head CT and preferably [an] MRI, admit[] [Owens to the hospital], and/or obtain[] [a] neurological consultation" resulted in a delay of the diagnosis

29

and treatment of Owens's conditions. And "[t]his delay resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension. Severe vision loss due to intracranial complication can generally be easily treated with medication if it is diagnosed early." With earlier detection and treatment, Owens's "vision would medically probably have been saved." *Cf. Patterson*, 412 S.W.3d at 839; *see also McKellar*, 367 S.W.3d at 485; *Woofter*, 2009 WL 3930839, at *7.

In support of their argument that it is insufficient for an expert report to merely state that a plaintiff "might have had a better outcome" without linking the expert's conclusion (that the plaintiff might have had a better outcome) to a doctor's alleged breach, Drs. Handyside and Prater rely on *Wright*. In *Wright*, the plaintiff alleged that a physician's assistant misread or misplaced an x-ray and, therefore, did not discover that the plaintiff had fractured her foot. 79 S.W.3d at 50. Approximately one month later, the plaintiff's orthopedic surgeon discovered the fracture. *Id.* The plaintiff served on the defendant the report of an expert, who stated that had the x-ray been properly read, the plaintiff "would have had the possibility of a better outcome." *Id.* at 51. The Texas Supreme Court, after recognizing that an expert in his report need not use any particular phrase, held that the trial court could have reasonably determined that the report did not represent a good-faith effort to summarize the causal relationship. *Id.* at 53. The supreme

30

court noted that the expert in his report simply opined that the plaintiff had "'the possibility of a better outcome,'" and did not sufficiently "link[] the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the hospital's] alleged breach (that it did not correctly read and act upon the x-rays)." *Id.*

Here, in contrast, Dr. Richardson does not simply assert that Owens would have had the "possibility of a better outcome" if not for Drs. Handyside's and Prater's alleged breaches of the standard of care. Instead, Richardson explains that the doctors' breaches caused a delay in the diagnosis and treatment of Owens's conditions. As stated in the report: "Untreated dural sinus thrombosis is well known to potentially cause idiopathic intracranial hypertension." The delay in diagnosis and treatment "resulted in the development of a complication, severe vision loss due to idiopathic intracranial hypertension." "It is medically probable that early diagnosis would have prevented [Owens's] later development of vision loss." The treatments available to prevent Owens's vision loss included medication, "serial lumbar punctures," "lumboperitoneal shunt placement," and "[o]ptic nerve fenestration." *See Khan v. Ramsey*, No. 01-12-00169-CV, 2013 WL 1183276, at *9 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (holding expert report sufficient where breach of standard of care caused delay in diagnosis, which resulted in "permanent disability"); *Foster v. Richardson*, 303 S.W.3d 833, 841 (Tex. App.—Fort Worth 2009, no pet.) (holding expert report

31

adequate regarding causation because it explained how doctor's delayed diagnosis subjected patient to prolonged pain); *Gelman v. Cuellar*, 268 S.W.3d 123, 130 (Tex. App.—Corpus Christi 2008, pet. denied) (holding expert report adequate regarding breach and causation because it explained had patient "been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency," which caused her "anoxic brain damage"); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding expert report sufficient because it explained negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries).

Based on the foregoing, Dr. Richardson's report represented a "good faith effort" to inform Drs. Handyside and Prater of the causal relationship between their failure to adhere to the pertinent standard of care and the injury, harm, or damages claimed. *See Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (emphasizing expert reports "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support"). Accordingly, we hold that the trial court erred to the extent that it granted Drs. Handyside's and Prater's motions to dismiss Owens's claims on the

ground that Richardson's expert report did not adequately address the issue of causation.[11]

We sustain Owens's second issue, in part.

**Vicarious Liability**

In her third issue, Owens argues that the trial court erred in dismissing her vicarious-liability claims against Memorial Hermann because an expert report is not necessary regarding such claims. Memorial Hermann asserts that dismissal of Owens's vicarious-liability claims against it is mandatory because Owens "failed to serve [a sufficient] expert report as to the individual physicians' conduct that [is] the basis of the vicarious liability claim[s]."

In addition to her direct-liability claims against Memorial Hermann, Owens alleges that it is vicariously liability for the conduct of its "nurses, technicians, servants and[/]or agents" and "Amy Rasmussen, M.D.; Brian Zachariah, M.D.; Krista G. Handyside, M.D.; Inez A. Serrano, P.A.; Samuel J. Prater, M.D.; [and] Kenneth A. Totz, [D.O., FACEP]."

"[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's

---

[11] In her brief, Owens also asserts that Dr. Richardson's report adequately addresses the standard of care as it relates to the doctors. However, because Drs. Handyside and Prater did not object to the report on this ground, we do not consider this portion of Owens's argument.

conduct under the vicarious theory." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013); *see also Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) ("When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient."). In other words, a report that is sufficient as to an employee, whose alleged negligent conduct a vicarious-liability claim is based, is also sufficient as to the employer health care provider. *See, e.g.*, *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 295 (Tex. App.—Fort Worth 2008, pet. denied) ("[I]f the expert report is sufficient as to the claims against Dr. Ward, and we have held that it is[,] . . . then the report is sufficient as to claims against CND that are based on Dr. Ward's alleged negligence." (Footnote omitted.)).

Here, we have held that the trial court erred in dismissing Owens's direct-liability claims against Drs. Handyside and Prater because Dr. Richardson's expert report complies with chapter 74 regarding Owens's allegations against the doctors. Therefore, contrary to Memorial Hermann's assertion, dismissal of Owens's vicarious-liability claims against it is not "mandatory." Instead, Owens may proceed on her vicarious-liability claims against Memorial Hermann based on the conduct of Drs. Handyside and Prater. *See Potts*, 392 S.W.3d at 632; *Gardner*, 274 S.W.3d at 671–72.

Further, we note that Owens alleges that Memorial Hermann is vicariously liable not only for the conduct of Drs. Handyside and Prater, but also for the conduct of "nurses, technicians, servants and[/]or agents," Drs. Rasmussen, Zachariah, and Totz, and physician assistant Serrano. Because Owens may proceed on her vicarious-liability claims against Memorial Hermann based on the alleged negligence of Drs. Handyside and Prater, she may also proceed on her vicarious-liability claims against Memorial Hermann based on the alleged negligent conduct of the other individuals. *See TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013) (holding plaintiff's vicarious-liability claim against hospital for actions of nurses could proceed because expert report adequate regarding plaintiff's vicarious-liability claim for negligent acts of doctors); *Potts*, 392 S.W.3d at 629–32 (plaintiff entitled to proceed with her entire suit against health care provider so long as expert report valid as to one theory of liability against defendant); *Huepers v. St. Luke's Episcopal Hosp.*, No. 01-11-00074-CV, 2013 WL 1804470, at *3–5 (Tex. App.—Houston [1st Dist.] Apr. 30, 2013, no pet.) (mem. op.) (holding no further report required where amended petition added new theory of vicarious liability against hospital based on nursing negligence because initial report sufficient as to plaintiff's vicarious-liability claim against hospital based on doctor conduct).

And because Dr. Richardson's report satisfies the requirements of chapter 74 as to Memorial Hermann's vicarious liability for the conduct of Drs. Handyside and Prater, Owens may also proceed on her direct-liability claims against Memorial Hermann.[12] *See Potts*, 392 S.W.3d at 629–32 (holding plaintiff's direct-liability claim against nursing staffing agency could proceed because expert report submitted by plaintiff supported her vicarious-liability claims); *Children's Med. Ctr. of Dall. v. Durham*, 402 S.W.3d 391, 403–04 (Tex. App.—Dallas 2013, no pet.) (concluding, because expert report valid as to vicarious-liability claims against hospital, plaintiffs' direct-liability claims against hospital "may proceed as well").

Accordingly, we hold that the trial court erred in granting Memorial Hermann's motion to dismiss Owens's direct- and vicarious-liability claims against it.

We sustain Owens's third issue.

---

[12] Because Dr. Richardson's expert report is sufficient as to Owens's vicarious-liability claims against Memorial Hermann, based on the conduct of Drs. Handyside and Prater, we need not consider the report's sufficiency as to Owens's direct-liability claims against Memorial Hermann. *See San Jacinto Methodist Hosp. v. McCoy*, No. 14-12-00682-CV, 2013 WL 3009318, at *5 n.3 (Tex. App.—Houston [14th Dist.] June 13, 2013, no pet.) (mem. op.). Therefore, as stated previously, we do not address the portion of Owens's second issue in which she asserts that Richardson's report is adequate as to the issues of standard of care and causation as it pertained to her direct-liability claims against Memorial Hermann.

## Conclusion

We reverse the trial court's dismissal of Owens's health care liability claims against Memorial Hermann and Drs. Handyside, Prater, and Totz. And we remand Owens's health care liability claims against them to the trial court for further proceedings consistent with this opinion.


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.